[No. B210909. Second Dist., Div. One. Apr. 16, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
IAN M. KING, Defendant and Appellant.

COUNSEL

Law Offices of Gerson S. Horn, Gerson S. Horn; and Jerald W. Newton for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson, Lawrence M. Daniels and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**JOHNSON, J.**—Ian M. King, an officer with the Los Angeles School Police Department (LASPD), made a traffic stop late one night in early May 2007. Nicole D., the young woman driving the car King pulled over, had made an illegal U-turn. After ascertaining that Nicole was lost and uninformed about

how police patdown searches should be conducted, King proceeded to conduct a full body search of the woman, including reaching inside her bra to "massage" her breasts, and digitally penetrating her vagina with each of his hands. This "search" was conducted on a public sidewalk, while King held both of Nicole's laced hands behind her back with one of his own. The entire search was conducted under the ruse that King needed to perform a field sobriety test on 21-year-old Nicole, who told him she had had one beer earlier, and that King also had to search Nicole's clothes and body for drugs and weapons. Nicole never said "no" to King, and did not try to leave or tell him to stop the search; she was afraid and did not know she could.

Marilyn E., a stranger to both King and Nicole, happened to drive by. She looked down a side street, where she saw a police officer arresting a young woman. The officer was using one of his hands to hold the woman's hands behind her back. His other hand was underneath the woman's dress. Troubled by what she saw, Marilyn circled back and drove by the scene, where she saw the officer still engaged in the same activity. Shortly thereafter, Marilyn and Nicole made independent 911 calls to report the incident. Each woman identified King as Nicole's assailant. King was tried and convicted on five counts of sexual assault.

On appeal, King contends (1) he received ineffective assistance of counsel; (2) the trial court denied him the right to cross-examine witnesses, and failed properly to instruct the jury; (3) the evidence was insufficient to justify the guilty verdicts; and (4) the sentence imposed was unconstitutional and illegal. We affirm.

*Procedural background*

An information charged King with sexual battery by restraint (Pen. Code,[1] § 243.4, subd. (a); count 1), unlawful genital penetration by a public official by threat of arrest or incarceration (§ 289, subd. (g); counts 2 & 4), and unlawful sexual penetration accomplished by force or duress (§ 289, subd. (a)(1); counts 3 & 5). King pleaded not guilty.

A jury convicted King on all five counts. King filed extensive posttrial motions seeking a new trial or acquittal. The motions were opposed, and a lengthy evidentiary hearing was conducted. Ultimately, the motions were denied.

The court denied probation, and sentenced King to 20 years in state prison: the upper term of eight years on count 3, as the base count, plus the upper

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

term of four years on count 1 (to run consecutively to count 3), plus the upper term of eight years on count 5 (to run consecutively to counts 1 and 3). The sentences on counts 2 (upper term of eight years) and 4 (upper term of eight years) were stayed pursuant to section 654. King was ordered to pay certain fines and fees, and to register as a sex offender pursuant to section 290.

*Prosecution case*

### 1. *The charged offenses*

In May 2007, Nicole was 21 years old. She lived with her parents in Orange County, where she attended college full time. On May 2, 2007, Nicole drove her parents' black Mercedes to Los Angeles about 8:00 p.m., for a date with David Gelb, whom she had been dating for about three months. They went out for dinner, during which Nicole drank one beer. After dinner, Nicole and David went to visit some friends, and stayed until midnight. Nicole drank one more beer during that visit.

Nicole and David went back to his neighborhood. He dropped Nicole off at her car, and she headed home by 1:00 a.m. She drove down La Brea to the Santa Monica (10) Freeway, but the eastbound on-ramp was closed. Nicole turned her car around, "got a little lost," and made an illegal U-turn. She was unfamiliar with the area, and did not know what street she was on. As she drove, Nicole noticed that a police car had begun to follow her. She became nervous. She drove back onto La Brea intending to take the westbound 10 freeway, then exit and get back on the freeway and head east when she could. As she entered the westbound on-ramp, Nicole saw that all eastbound lanes were closed, and exited at La Brea again. She drove south on La Brea, and turned on Adams. The police car was still following her.

Nicole did not see any open businesses where she could stop to ask for directions. She made an unlawful U-turn into the parking lot of a small grocery store. The police car followed her into the lot. As Nicole exited the lot, she made "direct eye contact" with the driver of the police car. As Nicole drove back onto Adams, the officer turned on the flashing lights on his car, and pulled her over. He directed Nicole to drive forward and turn right at the next street or driveway, as he did not want to block traffic. Nicole made a right-hand turn at the next street, and parked at the curb. The officer, who was working alone, parked his patrol car at a staggered angle behind Nicole's.

Nicole was nervous. The officer asked Nicole if she was lost, and if she was from the area. She told him she was not. He asked why she was there. Nicole said she had been on a date with her boyfriend. The officer told Nicole

she had made an illegal U-turn, and that he had run her plates. He asked Nicole for her I.D. Nicole handed him her driver's license, which he stuck into his belt. The officer was wearing a police uniform, with a badge and a name tag that said "King." At trial, Nicole identified appellant Ian King as the officer who had pulled her over early on the morning of May 3, 2007. Nicole believed King was an officer with the Los Angeles Police Department (LAPD).

King asked Nicole if she had been drinking. She said she had had one beer. Nicole had actually had two beers that evening—one at 9:00 p.m. and one at 11:00 p.m. Nicole did not tell King about the beer she had at dinner because she believed that alcohol had since been absorbed into her system. She was a little concerned that she had just turned 21 and had had beer, and that made her nervous about the situation in which she found herself. Nicole did not feel intoxicated.

King told Nicole he would have to perform a field sobriety test (FST). He went back to his patrol car for one or two minutes, leaving Nicole feeling "[s]cared and nervous." At one point, he pointed a spotlight at her. At trial, Nicole could not recall if the light bar on top of the police car or its headlights were on. She assumed King had a gun, but never saw one.

When King returned, he told Nicole to get out of her car, and had her stand on the sidewalk facing a building, with her back to the street. Nicole was wearing a dress that fell above her knees, a vest and leather jacket. King asked if Nicole had any weapons; she said no. He asked her to open her jacket so he could be sure. She did. He checked the pocket of her jacket and found a cell phone. At that moment, Nicole's boyfriend called.[2] She silenced the phone and put it back in her pocket.

King told Nicole he was going to "pat [her] down to make sure [she] didn't have any drugs or weapons." Before he began, King asked Nicole if she had "ever been searched by the LAPD before." She told him she had not. Nicole did not remember whether she told King he could pat her down, but she testified she "would have allowed a police officer to check [her] for weapons if that's what they wanted to do." She explained that's "just how [she] was raised, to just listen to authority, especially police officers, given [her] culture and religion." Nicole is Filipino and Catholic, and attended Catholic school for 13 years.

Nicole is five feet two inches, and weighs 107 pounds. King is five feet 11 inches, and weighs 200 pounds. King told Nicole to put her hands behind her

---

[2] Nicole's cell phone records indicate this call was received at 1:25 a.m.

back and interlace her fingers. King stood behind and slightly to the side of Nicole. He held both her hands behind her back with one of his hands as he began to pat her down. He maintained that stance and hold throughout the search. King began patting over the top of Nicole's clothes. At some point he "hit the wire area. Hit the bra." Nicole told him it was the underwire in her bra; King asked if he could check her breasts. Nicole did not know whether police officers were allowed to do such things. However, she did not feel as if she had a choice, and was not comfortable challenging or questioning King. She said yes.

King put his hand inside Nicole's bra. He began using a sort of "cupping massaging type . . . motion" on each breast, using both hands intermittently. Nicole estimated that King touched her breasts for about a minute in total. As King touched her breasts, Nicole "was hop[ing she] didn't get in trouble . . . [b]ecause [she] had had a beer at eleven o'clock." Nicole was uncomfortable and concerned that what King was doing "was really not okay," but she did not feel free to say no.[3]

After he stopped touching her breasts, King reached around behind Nicole, over her clothes, to "check[] [her] panty line," then reached up inside her dress and began patting the skin in the area of her stomach. King then moved his hand down toward Nicole's panties and put his hand on top of her pubic bone and vagina, outside of her underwear. Nicole stood still. King then asked Nicole if it was "okay to search and [she] said it was okay." Nicole was uncomfortable and afraid. King then asked Nicole "if it was okay to search [her] vagina for drugs." She said "sure." King inserted a finger or two into Nicole's vagina, and began what felt like a "patting" or "digging" motion around the inside and entirety of Nicole's vagina. King used both hands at alternate times. While King was engaged in this activity, Nicole asked him if "people hide drugs in their vagina?" He said, "Yeah, people hide balloons."

At one point while King had his fingers inside her vagina, some lights passed by, which Nicole assumed belonged to a car. King removed his fingers. Nicole testified that King "kind of looked around. And he looked uneasy. But after the car passed by, he reinserted his fingers in [her] vagina and resumed searching" with his other hand. Nicole estimated that King's fingers were inside of her for about 30 to 45 seconds before the lights passed by, and then an additional 25 to 30 seconds after he reinserted them, for a total of about "a minute, a minute and a half."

After King removed his fingers he asked Nicole "if he could look inside of [her] vagina." Nicole did not know why she did this, but for some reason she

---

[3] Nicole testified that throughout the time she was detained by King she did not know or feel as though she had an option to tell him not to touch her, and she never felt free to go.

began to lift her dress. Just then she saw lights, and another car passed by. For some reason, King decided not to peer inside Nicole's vagina. Instead, he searched her jacket pocket again, and recovered a mint wrapper.

King then conducted a "Horizontal Gaze Nystagmus" FST. King held a pen and a flashlight in one hand, which he waved from left to right, telling Nicole to follow with her eyes. When that test was done, Nicole asked King to show her to the freeway. He asked her, "How do you know I'm not going to arrest you or give you a ticket?" Nicole "stood there, hoping that he wouldn't give [her] a ticket with like a kind of a pleading look." She assumed she would not get a ticket because she was clearly not drunk and had no drugs. King said he would not give Nicole a ticket and agreed to lead her to the freeway. Reading the tag on his uniform, Nicole said, "Thank you, Officer King, for not giving me a ticket." King returned Nicole's driver's license, and drove behind her, directing her to the freeway entrance. At that point, Nicole was no longer afraid and did not think King would attack her or follow her home. King never searched Nicole's car or purse.

Once Nicole saw that King was not following her, she got off the freeway, and called her boyfriend for help with directions.[4] Nicole was "upset and still scared because . . . [she] was lost." She told David she had been pulled over and searched, but had not been given a ticket. Nicole did not disclose the details of what had happened with King because it "was kind of awkward," she "was embarrassed above all," and she and David had only been dating a short while.

Nicole then called her best friend, Jennifer Pablo, one of the people with whom she and David had spent time earlier that evening, and who was still with their other friends at the apartment they had visited. Nicole told Jennifer she had been pulled over, had been given a sobriety test and "got asked to be searched." Jennifer asked Nicole to explain what she meant by "searched." Nicole said: " 'Well, actually, I wanted to ask you guys' . . . 'this cop put his hands inside my vagina. I don't know if that was okay.' " Concerned, Jennifer immediately put the call on speakerphone so Nicole's other friends could hear. Another friend told Nicole what had happened to her was inappropriate, and she should report it; Nicole agreed to report the incident. At 1:38 a.m., Nicole called 411 for the LAPD number, and her call was transferred to 911.[5] A tape of that call played at trial reflects Nicole reported that, she had just been " 'stopped for a traffic incident and a police officer put his hands in [her] vagina and [she] need[ed] to know if this is okay or not.' "

---

[4] Nicole's cell phone records show this call was placed at 1:27 a.m.

[5] Nicole asked for the LAPD number because she thought King was an LAPD officer. She did not know King was a school police officer at the time he pulled her over. Nicole testified she did not call 911 because she was "a little bit naïve," and did not think the situation constituted an emergency.

At 1:45 a.m., Nicole was put in touch with LAPD Sergeant Ed Clark, whom she told about the incident with King. Nicole was interviewed by police officers at her home about 3:00 a.m., and taken for a medical examination about 11:00 a.m. Nicole told a nurse she had only had one beer to drink the night before. Nicole identified King in a photographic lineup.

2. *The eyewitness*

On May 3, 2007, sometime after 1:00 a.m., Marilyn E. was driving west on Adams Boulevard, at a speed of about 20 to 25 miles per hour. Her attention was drawn to a side street where, about 18 feet from the corner, she saw a police officer arresting a young woman. The woman's legs were spread apart, and her hands were behind her back. The officer was holding the woman's hands behind her back with one of his hands; his other hand was underneath the woman's dress. Marilyn did not recall that the top bar light of the police car—which was parked behind a dark Mercedes—was turned on, or just its headlights or a spotlight.

Marilyn knew something was wrong. She had been arrested in the past, and knew male officers were not supposed to search female suspects. At first, Marilyn felt conflicted, "kind of scared" and reluctant to become involved. But, after she thought about it and drove a couple blocks further, she turned and circled back. She turned around on Adams, made a left turn on Redondo, and another left at Westhaven, the first stop. Marilyn did not recall which street she had seen the people on, so she drove down Westhaven, easing up at each corner to look down the block. Once she spotted the lights of the police car on Sycamore, she turned left and headed down that street, toward Adams. Marilyn drove by the police officer and the woman. As she drove by, the officer turned to look, and he and Marilyn made eye contact. At trial, Marilyn identified King as the police officer she had seen that night. As Marilyn drove by, King was still engaged in his search, with his hand under the woman's dress. However, when he and Marilyn made eye contact, King withdrew his hand and began conducting a normal patdown search. As Marilyn pulled up to the corner of Adams to make a left-hand turn and leave the scene, she got the vehicle and license plate numbers of the patrol car and wrote them on her hand. Marilyn drove a few minutes to find a pay phone, and called 911. According to a transcript of that call, Marilyn told the 911 operator she had been driving "down Adams Boulevard and the street just before Redondo . . . there was an officer that pulled over a female. And she ha[d] on a short skirt and he was feeling all up underneath her dress. [Marilyn] went around the block again and came back. And he was still feeling all underneath her dress." Marilyn told the operator she "thought another officer female [*sic*] was supposed to come out and search a female." Marilyn's call was connected to LAPD Sergeants Clark and Carl Taylor about 1:30 a.m.

About 2:45 a.m., Marilyn was interviewed at the police station by Sergeant Taylor. She provided Sergeant Taylor with a description of the officer, and the license plate and vehicle numbers. Marilyn thought the patrol car she had seen belonged to the LAPD. Marilyn subsequently identified King in a photographic lineup.

### 3. *The investigation and LASPD policy*

After Sergeant Clark spoke with Nicole, he believed she had been assaulted by an LAPD officer. However, after checking the vehicle and license plate numbers Marilyn gave to Sergeant Taylor, Clark realized King was an LASPD officer, and he notified the chain of command in that agency. An LAPD team was assembled. The team included LAPD Detective David Cedeno (rape special section), and other members of the robbery/homicide division, which is responsible for handling high-profile sexual assault investigations, which this case promised to be because of the involvement of a police officer. King was arrested at LASPD headquarters at 6:45 a.m., at the end of his shift.

Stephen Dodson, acting deputy chief of LASPD's South Division, testified about LASPD policy. The LASPD is responsible for providing police services for the Los Angeles Unified School District (LAUSD). King became an LASPD officer in January 2005. LASPD officers work one of three shifts: day watch (6:30 a.m. to 4:30 p.m.), midday (1:30 p.m. to 10:30 p.m.), or early morning watch (10:30 p.m. to 7:00 a.m.). Officers working "off hours," that is, when school is not in session, are responsible primarily for property protection, responding to silent alarms, responding to radio calls reporting activity at night on or near campuses, and to provide security for evening maintenance workers on LAUSD campuses. Depending on the day of the week and the shift, six to 12 officers are on duty during evening hours. Officers working after dark generally work in pairs, and are not required to patrol alone. An officer patrolling alone is called an "L-car."

LASPD officers are empowered to enforce traffic laws if they see a violation. According to LASPD policy, an officer initiating a traffic stop is supposed to notify the dispatch center that he or she is making a traffic stop, which is characterized as "high" or "low" risk. An illegal U-turn is considered a low-risk traffic stop. For such a stop, the officer would be required to identify his or her unit, a description of the stopped vehicle, and the number and a description of the occupants in that car. Once finished, the officer must "clear" the traffic stop: that is, notify dispatch the task is complete. At that point, the officer is to state the disposition, such as whether a traffic citation or warning was issued. "Clearing" the traffic stop, "lets [LASPD] know that the officer's completed what he was doing and that he's now available for radio calls."

According to his daily field roster, King, who was patrolling in an "L-car" during the early morning hours of May 3, 2007, placed himself at Dorsey High School, near Rodeo and Crenshaw Boulevards, at 1:07 a.m. King's log reflects that call was cleared at 1:25 a.m., and that he was at Emerson Middle School, on the west side, at 1:32 a.m. Witnesses at trial testified that the fastest estimated travel time between those two LAUSD campuses—12 miles apart from one another—was 7 to 12 minutes. King's log did not reflect that he made any traffic stops between 12:55 a.m. and 3:00 a.m., or that he had run any license plates or driver's licenses between those times.

Deputy Chief Dodson testified that an LASPD officer may conduct a field search, customarily referred to as a patdown or "cursory search." Once a suspect had been arrested, the officer would conduct a patdown search to see if the suspect has weapons before transporting him or her in an LASPD vehicle. If a person is detained for an investigation, and the officer believes he or she might be a threat or is armed, the officer may perform a patdown search for purposes of officer safety, but only if the officer has articulable facts that the person may be armed and dangerous. A cursory search involves running one's hands over a suspect's outer clothing. It does not involve any grabbing, or entry into the suspect's pockets. A cursory search of a woman the size of Nicole, wearing a dress and jacket, would take 15 to 20 seconds. If a male officer has a female in custody, or detains a female and needs to search for weapons, LASPD policy dictates that the officer handcuff the suspect and call for a unit with a female officer. A male may search a female suspect in an emergency situation if there is an immediate threat to the officer, and no female officer is available. On May 3, 2007, one of the two LASPD sergeants on duty and available during King's shift was female.

More invasive "booking" searches are conducted after suspects are arrested and transported to the police station. All such searches must be conducted by an officer of the same sex as the suspect. In addition, LASPD policy requires that " 'all strip and visual body cavity searches shall have prior approval by the watch commander who shall evaluate the necessity of conducting each search case.' " If an officer believes contraband is secreted in a body cavity, a search warrant must be obtained and the prisoner transported to a medical facility where a body cavity search is performed by licensed medical personnel. All strip, visual and physical body searches are subject to the following requirements: " '(1) All persons present shall be of the same sex of the arrestee. (2) The search shall be conducted in "an area of privacy so that the search cannot be observed by persons not participating in the search." (3) Persons conducting the search "shall not touch the breasts, buttocks, or genitalia of the person being searched." ' " It is a violation of LASPD policy for a uniformed LASPD officer to touch the breasts or place his fingers inside the vagina of a woman whom he has pulled over for a traffic violation. If an

arrestee has a purse, it must be taken and searched immediately, to determine whether it contains deadly weapons or items of evidentiary value.

The Horizontal Gaze Nystagmus FST is one of a number of tests used by police officers to test an individual's sobriety. It is always used in conjunction with other FST's, because there are a variety of reasons one may have nystagmus.

LASPD officers are required to attend a police academy program, and to undergo additional postacademy field training. Each officer's training file should contain a receipt showing his or her receipt of the LASPD Policy and Procedures Manual. The receipt in King's file reflected he had completed his training in early February 2005.

Guy Holloman was the LAPD criminalist assigned to this matter. He testified his tests revealed that no DNA linking King and Nicole was found on King's fingers, in his fingernail scrapings or his patrol car, or in Nicole's sexual assault kit. No epithelial cells from Nicole's vagina were found on the swabs.[6] Epithelial cells may be found on objects, such as a steering wheel, or on fingers. Holloman would have expected to find epithelial cells under King's nails if he used a digging motion with his finger in a vagina. However, a thorough washing of one's hands can remove epithelial cells. Holloman testified that DNA can be transferred by perspiration. An absence of DNA evidence does not mean no crime occurred.

### 4. *Evidence of uncharged act*

In 2006, Regina S. was a senior at University High School (UHS). King was the LASPD officer assigned to UHS at the time. In early April 2006, King requested permission from Regina's ceramics teacher to talk to Regina outside class. Regina, who had recently had an argument with an administrator regarding Regina's resistance to attending detention as punishment for her inability to arrive at school on time, thought King was there to discuss the tardiness problem. Regina had seen King around the school campus, but did not know him.

Regina walked with King toward his office, discussing the school's tardy policy. King mentioned that he knew Regina planned to attend the University

---

[6] Holloman's tests had revealed the presence of DNA from an unknown male on Nicole's breast. Prior to trial, the prosecutor filed a motion to prohibit testimony on this point, arguing Nicole's prior sexual conduct was irrelevant, as was the issue of consent. King argued the evidence was relevant to test Nicole's memory. The trial court excluded the evidence on the issue of consent or prior sexual conduct, and noted Nicole's memory could be tested by other, less embarrassing, lines of questioning.

of Arizona; Regina asked him how he knew that. King's office was located in a remote area of the basement of the main administration building, an area generally off-limits to students, commonly known as "the dungeon." They entered the office and King shut the door. Regina sat on a couch; King stood leaning against the desk, facing her.

Regina continued talking about the tardy policy. King cut her off, saying, " 'This isn't about the tardy policy. This is about you and me. I've taken a personal interest in you.' " He told Regina not to think of him as a police officer, but to look at him as a friend. Regina felt confused and awkward. She responded: " 'I don't think that's going to work. You're a police officer. We're not on that level.' " King asked Regina what her reputation at school was like, and whether she was a "slut" or a "whore." Shocked by the question, Regina told King she did not know or care what people thought of her. King asked her what the boys thought of her. Regina said she did not know; some people liked her, others did not. King told her, " 'They're lying to you. They think you're hot.' " Regina was shocked that a police officer could say such things to her.

King then asked Regina if she gave "blowjobs under the table." Regina asked King whether it was legal for him to ask her such a question. He said, " 'Sure, you're 18.' " Regina had never disclosed her age to King. King continued "on about the blowjob thing."

King then started, talking to Regina about going to college in Arizona, how he knew her first choice had been the University of California, Santa Barbara, and asked her about her twin brother. Regina had no idea how King had obtained some of this information.

King then asked Regina to "stand closer" to him. She declined. He told her, "I know you have a belly button ring. Most girls would have shown it to me by now." Again, Regina wondered how King knew about her belly button ring, which she thought only her friends knew. In response, Regina said she was not " 'most girls.' " King told Regina she was " 'not anything like [he] expected.' " He " 'thought [she was] fun and outgoing.' " Regina said she was, but "not in this situation," and reminded King he was a police officer and she was a student. King asked Regina again to show him her belly button ring; she declined again. When King asked a third time, Regina lifted her sweater "for a second," and sat back down. Regina never felt free to leave while she was in King's office.

Afraid of what King might do next, Regina suggested they go outside and said she had to get back to class. As he walked her back, King told Regina he was "just preparing" her for college because she would "get taken advantage

of at Arizona." He asked Regina if she found him attractive. Regina told him it did not seem " 'right between [them].' " King said it was "okay." He told Regina he had " 'six weeks till [she] graduate[d],' " and he was " 'going to make [her] like [him],' " and that Arizona was only "a short drive away." Before Regina reentered her class, King advised her not to "say anything to anyone because we don't want rumors going on about you." King kept Regina out of class for over 40 minutes. During their conversation, King told Regina he was smarter than her because "he had a lot of degrees in law," had several businesses and had attended the University of Southern California. Regina reported the incident to the assistant principal of UHS. She never saw King again until she identified him at trial.

About 9:00 p.m. on Memorial Day, someone claiming to be a lieutenant or detective phoned Regina at her parents' home. The caller asked Regina to describe the incident with King; she did. The caller told Regina that King had only had "good things to say" about her, and that "what [she] was doing was wrong." He told Regina she could " 'forget about going to Arizona . . . because [she was] going to be here every two weeks in trial,' " and her " 'college plans [would] be ruined.' " The caller said he wanted Regina to understand this would be one of the consequences if she went " 'through with all this.' " Regina, who knew she was not "going through with anything," realized she was being pressured inappropriately. She told the caller to contact the principal of her school, and hung up.[7]

A search of King's apartment subsequent to his arrest yielded photographs of Regina and her twin brother, personal information about Regina, including her place of birth, address and phone number, parents' names, and her UHS class schedule and transcripts.[8]

LASPD officers may be assigned to specific school campuses. According to Deputy Chief Dodson, with respect to such officers' contact with students, LASPD policy states: " 'All officer contacts with students must be prudent and conducted in such manner that precludes any concern of impropriety. Situations should be avoided which would result in an officer becoming isolated in a location (i.e., behind closed doors in an office) . . .' [¶] . . . [¶] 'with a student of the opposite sex without another responsible adult . . . present. Conduct with students should be limited to on-duty status or school/district sponsored activities. [¶] Officers should be receptive to student problems;

---

[7] The trial court twice instructed the jury that Regina's testimony about the call she received was offered for the limited purpose of evaluating her demeanor and any action she may subsequently have taken, and that there was no indication the call had been made by or at the behest of King.

[8] The search also yielded sexually explicit photographs recovered from King's computer; the photos were not offered in evidence and are not at issue.

however, if the problem does not fall within the scope of officer duties, the students shall be referred to an appropriate counselor/school personnel.' "

*Defense case*

On January 21, 2008, Christopher Nicely took photographs and measurements of the area around Adams and Sycamore. Nicely testified about the distances between various physical locations in the vicinity. His testimony was offered to demonstrate it would have taken Marilyn about two minutes to cover the distance and route she claimed to have traveled.

## DISCUSSION

1. *Ineffective assistance of counsel*

 a. *Controlling principles*

■ King maintains he was denied effective assistance of counsel. In order to demonstrate ineffective assistance of counsel, King must show counsel's representation was so deficient as to undermine confidence in the resulting judgment. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*); accord, *People v. Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839] (*Ledesma*).) A party claiming ineffective assistance must first demonstrate that his counsel's performance was deficient. (*Strickland, supra*, 466 U.S. at p. 687; *Ledesma, supra*, 43 Cal.3d at p. 216.) In reviewing counsel's performance, we "exercise deferential scrutiny." (*Ledesma, supra*, 43 Cal.3d at p. 216; accord, *Strickland, supra*, 466 U.S. at p. 691.) To that end, it is up to King to show his counsel's performance was deficient because his " 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 436 [48 Cal.Rptr.2d 525, 907 P.2d 373].) Second, even after a party demonstrates ineffective assistance, he must also show he has been prejudiced, i.e., "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694.) If King's showing as to either component is insufficient, the claim fails. (*People v. Holt* (1997) 15 Cal.4th 619, 703 [63 Cal.Rptr.2d 782, 937 P.2d 213].) Accordingly, if he cannot show prejudice, we may reject his claim of ineffective assistance, and need not address the adequacy of trial counsel's performance. (*Strickland, supra*, 466 U.S. at p. 697; *People v. Lawley* (2002) 27 Cal.4th 102, 136 [115 Cal.Rptr.2d 614, 38 P.3d 461].)

Two other principles bear mention: First, the reviewing court defers to " ' "counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.' " [Citation.]' " (*People v. Hinton* (2006) 37 Cal.4th 839, 876 [38 Cal.Rptr.3d 149, 126 P.3d 981].) Second, to the extent the record is silent as to defense counsel's reasons for his actions or inaction, a claim of ineffective assistance must be rejected. We may reverse on grounds of ineffective assistance of counsel only if the record affirmatively discloses no rational purpose for counsel's act or omission. (*People v. Lucas, supra*, 12 Cal.4th at p. 437.) Where the record contains no explanation for the challenged representation, we will reject an ineffective assistance claim unless counsel was asked to explain his performance and failed to provide an explanation, or unless there simply could be no satisfactory explanation. (*People v. Earp* (1999) 20 Cal.4th 826, 871 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

### b. *King's contentions of incompetence*

King makes multiple claims of ineffective assistance of counsel. He maintains his trial counsel was ineffective in that he failed to (1) file a written motion to exclude Regina's testimony; (2) introduce significant defense evidence; (3) cross-examine Holloman regarding DNA found on Nicole's breast; (4) object to prejudicial evidence and misleading assertions of law by the prosecutor; (5) move to dismiss or file a demurrer to certain counts; (6) introduce evidence King was not a sexual predator, and other character and reputation evidence; (7) submit certain pinpoint jury instructions; and (8) object to religious testimony by Nicole.[9] We address each contention in turn.

#### (1) *Failure to seek exclusion of Regina's testimony*

Prior to trial, the prosecution moved, in limine, arguing that evidence of King's uncharged "prior sexual offense" against Regina at UHS should be admitted either to demonstrate King's propensity to commit sex crimes, under Evidence Code section 1108 (section 1108), subdivision (a), or to establish motive, intent or the absence of mistake as to the acts currently charged against him, under Evidence Code section 1101 (section 1101), subdivision (b). The trial court rejected the prosecutor's theory as to section 1108, but accepted the assertion that the evidence was relevant to establish intent.

King acknowledges that his trial counsel orally opposed admission of evidence related to Regina. Nevertheless, King maintains his trial attorney

---

[9] King also contends his trial counsel was ineffective for failing to move to quash or traverse the search warrant. We agree the warrant was problematic. We need not, however, address the merits of this argument in light of our conclusion, *post*, that evidence related to Regina, the only evidence at issue obtained as a result of the warrant, was erroneously admitted.

was ineffective for failing to file *written* opposition to the prosecution's evidentiary motion, or an affirmative motion to exclude Regina's testimony at the outset. Specifically, he contends his counsel failed "to clarify when other acts are admissible on intent, . . . to distinguish the cases cited by the prosecution and . . . to discuss the inherent prejudice of such evidence." This contention has no merit.

King cannot show he was prejudiced simply because his trial counsel failed to file a written opposition to admission of Regina's testimony. The issue was litigated vigorously at the hearing. King's counsel opposed admission of Regina's testimony under section 1101, subdivision (b), and argued that the other crime evidence involving Regina was too dissimilar to the alleged acts against Nicole. King fails to point to any authorities finding ineffective assistance of counsel for the mere failure to file a written opposition when oral argument—particularly as vigorous as that in which counsel engaged here—occurred.

King contends that the submission of written opposition would have demonstrated that intent was not at issue, pointed out flaws in the prosecution's arguments, stressed the need for a balancing test under Evidence Code section 352, and shown the evidence in question was actually propensity evidence, prohibited under section 1101, subdivision (a). While we reject the assertion that written opposition was required, we agree the evidence related to Regina was improperly admitted.

■ The trial court admitted evidence of the uncharged incident with Regina under section 1101, subdivision (b), for the limited purpose of showing King's "intent."[10] Under section 1101, evidence that a defendant has committed crimes other than those for which he is being tried is barred "if it is offered to prove [his] criminal disposition, but not if it is offered to prove a material disputed issue such as motive or intent. [Citation.]" (*People v. Hayes* (1990) 52 Cal.3d 577, 616–617 [276 Cal.Rptr. 874, 802 P.2d 376]; see § 1101, subd. (b).) Evidence of an uncharged offense is admissible to prove identity, common plan or intent only if it is sufficiently similar to the charged offense to support a rational inference of identity, common plan or intent. (*People v. Carter* (2005) 36 Cal.4th 1114, 1147 [32 Cal.Rptr.3d 759, 117 P.3d 476].) With respect to intent, " 'the uncharged crimes need only be "sufficiently similar [to the charged offenses] to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' " [Citation.]' " (*Id.* at p. 1149.) So long as there is a direct relationship between the prior offense and an element of the

---

[10] The jury received instruction, both at the time Regina testified and when it received its general instructions regarding the limited purpose for which the testimony was offered.

charged offense, introduction of that evidence is proper. (*People v. Daniels* (1991) 52 Cal.3d 815, 857 [277 Cal.Rptr. 122, 802 P.2d 906].)

In *People v. Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*), the California Supreme Court held, "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*Id.* at p. 402.) Moreover, as for admission of evidence of prior uncharged acts, the court explained, "[e]vidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. 'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' [Citation.]" (*Id.* at p. 394, fn. 2.) Here, the acts in which King was alleged to have engaged (touching Nicole's breasts and vagina) were not conceded or assumed; they were contested.

*Bowen v. Ryan* (2008) 163 Cal.App.4th 916 [78 Cal.Rptr.3d 128], provides a useful illustration of the limitation on the use of evidence of other acts to establish intent. In *Bowen*, a patient sued a pediatric dentist for assault and battery, claiming the dentist choked and restrained him, shoved him against a wall, and threatened him with harm during a dental visit in 2002, after the child became afraid of a shot the dentist was about to administer. (*Id.* at pp. 919–920.) The trial court permitted the plaintiff to introduce evidence of other incidents between the dentist and other patients, which it deemed relevant for the purpose of demonstrating a common plan and design, as well as intent. (*Id.* at pp. 921–922, 923.) On appeal, the court found the evidence of prior uncharged acts inadmissible to prove intent, because intent was not at issue. The court noted that the plaintiff claimed the dentist had choked him and shoved him against a wall. If the defendant had conceded having done so, but had claimed the acts occurred accidently or otherwise, evidence of prior acts might have been admissible to establish intent. However, because the dentist denied having choked or shoved the child, the acts were neither conceded nor assumed. Accordingly, since the defendant's intent was not at issue, "[e]vidence of uncharged acts could not be admitted to prove an irrelevant matter." (*Id.* at p. 926.)

In *Ewoldt*, the charged and uncharged acts were far more similar than the uncharged and charged acts at issue here. There, the counts charged against

the defendant involved his fondling of the victim's vaginal area, undressing her and trying to force her knees apart; removing her clothes and trying to force her legs apart; entering her bedroom and forcing her to touch his erect penis; and entering her bedroom and touching her breasts, then telling her he was merely covering her with a blanket when she awoke. (*Ewoldt, supra*, 7 Cal.4th at pp. 388–389.) The uncharged acts involved three occasions on which the defendant fondled the victim's sister's breasts and vagina while she was sleeping. On one of those prior occasions the defendant similarly had told the victim's sister he was " 'straightening up the covers.' " (*Id.* at p. 389.) These acts were very similar to the charged conduct.

Here, in contrast, in the uncharged incident, Regina was never touched; Nicole's breasts were fondled and her vagina digitally penetrated. The incident with Regina occurred after King, an officer stationed at her school, who had clearly been focused on her for some period of time and who had obtained a significant amount of information about Regina's life, some of which she thought only her close friends knew, specifically sought Regina out and extracted her from her class. Nicole, on the other hand, was a complete stranger to King, who happened upon her by chance when she became lost late one night and he made what at least began as a legitimate traffic stop. King engaged in arguably threatening, sexually offensive and boorish behavior in the interaction with Regina. He frightened her, but there was no physical contact.[11] With Nicole, there is no question that King engaged in physically assaultive sexual contact. We agree with the trial court that the events shared other similarities, in that both women were young and relatively close in age, King made a purposeful effort to direct each of them to isolated locations, and used his authority to control them in the first place. Nevertheless, the dissimilarities between King's conduct toward Regina and Nicole were significant, while commonalities between the incidents were superficial.[12]

---

[11] King may have been attempting to manipulate Regina into engaging in sexual contact with him by asking her about blow jobs, and to show him her belly button ring. However, his comments could also be interpreted as a wholly inappropriate and misguided attempt to initiate a relationship with her, one which might last even after she moved the "short distance" to Arizona to attend college in a few months. In any event, as inappropriate as King's behavior during the incident with Regina was, it differed markedly from his conduct during the incident with Nicole, whom he physically touched and sexually assaulted during a purported, but entirely unnecessary and unlawful, search for weapons and drugs. The evidence of King's intent to sexually arouse himself during the incident with Nicole is quite evident; indeed, apart from an intent to humiliate his victim, there can be little other purpose for such acts. In the case of Regina, however, King's behavior was more nuanced, and his purpose in initiating that encounter is subject to at least one reasonable interpretation that does not involve immediate sexual arousal.

[12] We agree with King that the prosecution's reliance on *People v. Soto* (1998) 64 Cal.App.4th 966, 976–977 [75 Cal.Rptr.2d 605], to support its assertion that the evidence involving the incident with Regina was admissible to prove intent, is misplaced. In *Soto*,

However, even where the evidence is relevant under section 1101, subdivision (b), the court in *Ewoldt* held that "[e]vidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' [Citation.]" (*Ewoldt, supra*, 7 Cal.4th at p. 404.) Such evidence " 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352. [Citations.]' " (*Id.* at p. 404.) The probative value of uncharged prior misconduct found relevant under section 1101, subdivision (b) depends largely on the similarity of the uncharged misconduct to the charged offense. (*Ewoldt, supra*, 7 Cal.4th at p. 404.) The trial court has broad discretion to admit such evidence. We review the court's ruling for abuse of discretion. (*People v. Kipp* (1998) 18 Cal.4th 349, 369 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) The ruling will not be reversed unless the probability that prejudice resulting from admission of the evidence outweighs the probative value of the evidence. (*People v. Butler* (2005) 127 Cal.App.4th 49, 60 [25 Cal.Rptr.3d 154].) Viewed against this backdrop, we find the trial court erred. The prejudicial evidence of the incident involving Regina is too dissimilar from the charged offenses to be probative of King's intent on the occasion involving Nicole.

Notwithstanding our finding that the trial court erred in admitting the evidence of prior acts, we also find that error was harmless. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The direct and circumstantial evidence against King in this case was both virtually uncontradicted and overwhelming, and based on testimony independently offered by two eyewitnesses of wholly independent origin and through a wholly independent chain of reporting.[13] On this record, we conclude it was harmless beyond a reasonable doubt that the additional testimony regarding the incident involving King's predatory conduct with Regina contributed to the verdict. Given the ruinous nature of the other evidence against King, he cannot show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" if his counsel had filed written opposition to exclude this evidence. (*Strickland, supra*, 466 U.S. at p. 694.)

---

evidence of uncharged acts was deemed admissible as propensity evidence under section 1108, not evidence of intent under section 1101.

[13] There are discrepancies between Nicole's recollection of the amount of time that passed during the assaults and the cell phone records regarding when she received a call from or made a call to her boyfriend, and how long it took Marilyn to drive back to the scene. Those discrepancies are trivial.

### (2) *Failure to introduce significant defense evidence*

King contends his defense counsel was ineffective by failing to introduce "significant defense evidence" consisting of the fact that (1) Nicole told the nurse who conducted her medical examination she drank one beer, not two; (2) the existence of a discrepancy as to the exact time the crime occurred, which made it unlikely Marilyn could actually have witnessed the incident, given the amount of time King's witness said was required to travel the route she described; (3) counsel's failure to ask Nicole why she did not stop at an open gas station for directions; and (4) counsel's failure to ask Nicole whether King threatened to arrest her. None of these contentions has merit.

First, and most importantly, King cannot show prejudice. Even if his attorney had introduced the evidence as King claims he should have, its value for purposes of impeachment was minimal.

Second, Nicole's explanation for having told King she only had one beer when she had two—she believed the first beer was out of her system by the time King stopped her—would also apply to why she told the nurse she had only one beer. Moreover, King's counsel did elicit the fact that Nicole had not been truthful about the amount of alcohol she had consumed, so additional evidence on this point would have been redundant.

Third, whether the incident occurred at or around 1:25 a.m. is trivial. Minor discrepancies as to timing cannot negate the fact that both Nicole *and* Marilyn independently identified King as the police officer who sexually assaulted Nicole. Whatever time it took for Marilyn to circle back to the crime scene did not make her ability to witness the incident "impossible." She saw King with his hand under Nicole's dress the first time she drove by. When she returned to the scene, Marilyn observed King in the same position, before he removed his hand and pretended to conduct a normal patdown search, a sequence of events corroborated by Nicole. By 1:30 a.m., Marilyn had located a pay phone and contacted the LAPD; within 15 minutes, Nicole had also contacted the LAPD.

Fourth, questions as to whether King threatened to arrest Nicole or why she failed to stop at an open gas station have negligible effect on her credibility. Nicole never claimed King threatened to arrest her if she failed to cooperate with the search. Rather, his actions implied such a threat, which he only verbalized after he conducted the ineffective FST. Similarly, the fact that Nicole failed to notice an open gas station, or to stop to ask for directions, only buttresses her claim that she was lost and disoriented. Indeed, King could tell Nicole was lost before he stopped her. The evidence against King was overwhelming. Had counsel traveled these trivial lanes of inquiry, he

would still not have been able to circumvent the roadblock constituted by the independently derived accounts of Nicole and Marilyn.

### (3) *Failure to cross-examine regarding DNA on Nicole's breast*

King contends his defense counsel was ineffective for failing to cross-examine Holloman about DNA found on Nicole's breast. King argues that the evidence contradicted Holloman's testimony about transferability of DNA and that cross-examination on this point was "critical." We disagree.

Prior to trial, the prosecution moved to exclude any reference to Nicole's sexual activity, including the DNA of an unknown male found on her breast. At the hearing on that motion, defense counsel opined that the evidence might be germane to Nicole's recollection of the events. Observing that the DNA was not King's, that Nicole had a boyfriend at the time of the incident, and that there was no allegation King had licked her breast, the trial court found the evidence irrelevant. The court also found the evidence would be confusing and embarrassing to Nicole, whose memory could be tested in other ways. The court gave King's counsel leave to renew his objection later.

Holloman testified no DNA was found that linked King to Nicole or vice versa. Holloman testified that King *could* have transferred his epithelial cells present in his hands during perspiration to Nicole. He stated a successful transfer depended on multiple factors, including the level of perspiration and the duration of skin-to-skin contact between King and Nicole. Holloman also testified that the absence of DNA cells would not prove the offense had not occurred, and said epithelial cells could be removed by a thorough washing.

Holloman's testimony about the transferability of DNA by perspiration did not open the door for cross-examination regarding the DNA on Nicole's breast. The presence of an unknown male's DNA on Nicole's breast did not contradict Holloman's testimony. Consistent with that evidence, an unknown male could have transferred his DNA by epithelial cells to Nicole because he perspired more than King or was in contact with Nicole's breast longer than King was. Or, as observed by the trial court, the unknown male might have transferred his DNA by licking Nicole's breast, not by touching her with a perspiring hand. Holloman did not testify about this possibility. In either case, the court's ruling that this evidence was both irrelevant to the material issues and unduly prejudicial was correct. Whether another male touched or licked Nicole's breast before King assaulted her was irrelevant. Further, we agree that introduction of this irrelevant subject matter would serve only to further embarrass and humiliate Nicole. King's trial counsel was not ineffective for failing to raise the issue. A defendant has no right to cross-examine "in whatever way, and to whatever extent, the defense might

wish." (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20 [88 L.Ed.2d 15, 106 S.Ct. 292].) The trial court may restrict cross-examination where prejudice substantially outweighs probative value. (*People v. Harris* (1989) 47 Cal.3d 1047, 1091 [255 Cal.Rptr. 352, 767 P.2d 619].)

In any event, we return to the pivotal point that, independent of the question of whether King's counsel performed deficiently, King's claim of ineffective assistance of counsel may be disposed of on the ground that he has failed to show sufficient prejudice. "If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim [of ineffective assistance] on that ground without determining whether counsel's performance was deficient." (*People v. Kipp, supra*, 18 Cal.4th at p. 366; see *In re Resendiz* (2001) 25 Cal.4th 230, 239 [105 Cal.Rptr.2d 431, 19 P.3d 1171].) On this record, there is no reason to address whether King's counsel performed deficiently by failing to cross-examine Holloman regarding the DNA found on Nicole's breast because the evidence against King was overwhelming. His identity was established by testimony from Nicole and Marilyn, not DNA evidence. King simply cannot show that but for his attorney's performance, there is a reasonable probability the result would have been different.

### (4) *Failure to object to evidence and argument*

King maintains his trial counsel was ineffective because he failed to object to evidence and to the prosecutor's argument. King argues that defense counsel should have objected to (1) the prosecutor's argument the jury had to find that Nicole or Marilyn lied in order to find King not guilty; (2) Deputy Chief Dodson's testimony that an LASPD officer "can't arbitrarily walk up and say 'can I search you,' " which King contends is an incorrect statement of law; (3) Sergeant Clark's purportedly irrelevant and prejudicial testimony that he notified the chains of command in the LAPD and LASPD; (4) Sergeant Clark's prejudicial testimony that he contacted the robbery/homicide division; and (5) Detective Cedeno's unnecessary and prejudicial testimony that he was assigned to LASPD's robbery/homicide division's rape special squad.

■ First, the prosecutor did not err by arguing the jury had to find either Nicole or Marilyn lied in order to find King not guilty. "At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom. [Citations.]" (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11].) A prosecutor has " 'wide latitude' " in this regard, and whether the inferences he or she " 'draws are reasonable is for the jury to decide.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1203 [17 Cal.Rptr.3d 532, 95 P.3d 811].) Nevertheless, " 'counsel may not assume or state facts not in evidence [citation] or

mischaracterize the evidence [citation].' [Citation.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 249 [25 Cal.Rptr.3d 224, 106 P.3d 895].)

In her opening argument, the prosecutor reviewed the relevant factors in assessing witness credibility and Nicole's testimony. She read from CALJIC No. 2.27 ("Sufficiency of Testimony of One Witness" (some capitalization omitted)) and informed the jury, "In short, if you believe Nicole, then you must find the defendant, Ian King, guilty. And the converse of that, is also true. To find him not guilty, you have to believe that Nicole is lying." Later, the prosecutor commented, "And as I said earlier, that you have to believe that Nicole is lying to find him not guilty and you also have to find that Marilyn is lying to find him not guilty." In closing argument, the prosecutor argued that DNA evidence was unnecessary in this case because "either you believe Nicole and Marilyn and all the evidence that goes to corroborate them, the 911 calls, their prior statements or you don't." The evidence against King was based almost entirely on Nicole's and Marilyn's testimony. As King's fate rested on whether the jury found them credible, the prosecutor's comments served only to highlight CALJIC No. 2.27, that "[t]estimony concerning any fact by one witness, which [the jury] believe[s], is sufficient for the proof of that fact."

Moreover, contrary to King's claim, the prosecutor did not "ignor[e] the burden of proof." The court instructed the jury on the burden of proof, with CALJIC No. 2.90, and the prosecutor referred to that instruction repeatedly in her argument. The prosecutor's comments were proper, and an objection by defense counsel would have been futile.

■ We also disagree that defense counsel was ineffective for failing to object to testimony by Deputy Chief Dodson, Sergeant Clark or Detective Cedeno. Dodson's testimony that an officer required a reasonable suspicion to detain a person was an accurate statement of law. (See Com. to CALJIC No. 9.27 (Fall 2007 ed.), citing *Brown v. Texas* (1979) 443 U.S. 47 [61 L.Ed.2d 357, 99 S.Ct. 2637] ["An officer may detain a suspect briefly for questioning although no probable cause to believe suspect is involved in criminal activity, but he must have a reasonable suspicion based on objective facts, that the suspect is involved in criminal activity."].)[14]

■ As for Sergeant Clark's testimony that he notified the chain of command, it was relevant to show how the investigation leading to King's identification and arrest unfolded. Sergeant Clark's testimony that he contacted the robbery/homicide division because they investigated high-profile

---

[14] King's reliance on *United States v. Drayton* (2002) 536 U.S. 194 [153 L.Ed.2d 242, 122 S.Ct. 2105], is misplaced. Nicole was "seized" because a reasonable person in her situation would not have felt free to terminate the encounter, and never felt free to leave.

sexual assault cases did not imply the crime at issue required special techniques. Rather, it meant simply that the case fell within their jurisdiction due to the nature of the crime and the fact that King was a police officer.[15] Similarly, Detective Cedeno's testimony regarding his assignment to "Robbery/Homicide Division, Rape Special Section" was foundational, and did not suggest anything "special" about the case apart from the fact that a police officer was involved. Objections to these statements would have been futile. (*People v. Cudjo* (1993) 6 Cal.4th 585, 616 [25 Cal.Rptr.2d 390, 863 P.2d 635] ["[b]ecause there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance"]; see also *People v. Diaz* (1992) 3 Cal.4th 495, 562 [11 Cal.Rptr.2d 353, 834 P.2d 1171] [failure to object to admissible evidence does not constitute ineffective assistance of counsel because objection would have been futile].)

King cannot show prejudice as a result of any of these purported missteps by his trial counsel. The evidence against him was overwhelming. He cannot establish that, but for counsel's performance, there is a reasonable probability the result would have been different.

### (5) *Failure to file a motion to dismiss or a demurrer*

King contends that his defense counsel was ineffective in failing to move to dismiss (§ 995) or file a demurrer (§ 1004).

King acknowledges that the first attorneys representing him did seek dismissal of counts 2 and 4 at the preliminary hearing. However, he contends trial counsel was compelled to seek dismissal of those counts again once the information was filed, "as there was no direct evidence that Nicole was threatened with arrest." This assertion lacks support in the record.

First, Nicole's testimony at trial makes it abundantly clear that throughout the time she was detained, King took full advantage of his position of authority, using it as nothing less than a veiled threat. Even before she got out of her car, King falsely informed Nicole he had called in her license plates, and had taken her driver's license out of her possession. He then conducted an invasive "search," after Nicole admitted having consumed a beer several hours earlier, furthering her unwarranted concern that she could be arrested for having done so. Nicole testified that throughout the sexual assault she was worried and "hope[d] [she didn't] get in trouble" for having had the drinks, even though she was 21 and did not feel intoxicated. Finally, after he finished

---

[15] The LAPD's presumption that King's status as a police officer would heighten the profile of the matter, and draw significant public attention to the case was borne out by numerous media inquiries received by the court and the prosecutor's office before trial.

the sexually assaultive "search" and the ruse that passed for an FST, King verbalized his previously implicit threat by asking Nicole why she thought he would not "arrest" her or give her a ticket. The record contains direct evidence Nicole was threatened with arrest. King's counsel did not perform ineffectively by failing to move a second time to have counts 2 and 4 dismissed following filing of the information.

As for filing a demurrer, King fails to allege any pleading defects or to state the grounds on which such a motion could have been based. (See *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1090 [40 Cal.Rptr.2d 402, 892 P.2d 1145] ["A demurrer to a criminal complaint lies only to challenge the sufficiency of the pleading and raises only issues of law. [Citations.] [S]ection 1004 expressly limits demurrers to defects appearing on the face of the accusatory pleading . . . ."].) Section 1004 specifically *allows* filing in the alternative under section 954. "The Sixth Amendment does not require counsel ' "to waste the court's time with futile or frivolous motions." ' [Citation.]" (*People v. Memro* (1995) 11 Cal.4th 786, 834 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Defense counsel was not ineffective in failing to file a demurrer.

Again, we note that King cannot show prejudice. The evidence against him was overwhelming. Substantial evidence supports the verdicts. He cannot establish that, but for counsel's performance, there is a reasonable probability the result of the proceeding would have been more favorable.

### (6) *Failure to introduce evidence King was not a sexual predator*

King contends defense counsel was ineffective by failing to introduce evidence that he was not a sexual predator to rebut Regina's testimony. He asserts that a report prepared by Dr. Jeffrey Whiting, who concluded King was not a sexual deviant, as well as numerous other witnesses prepared to attest to his good character and reputation, were available and should have been introduced.

We agree Regina's testimony was improperly admitted. We cannot, however, find fault with King's counsel's decision not to present evidence to demonstrate King was not a sexual predator. Certainly, King had the right to present evidence of his good character under Evidence Code section 1102, particularly after the court permitted admission of the other crimes evidence under section 1101. When King's counsel raised this point at trial, the court

noted its relevance could depend on the type of character evidence King planned to present, and would revisit the issue at the appropriate time.[16]

After trial, at a hearing on King's motion for a new trial, his new attorneys argued that trial counsel should have sought admission of Whiting's report. The court disagreed, noting that Whiting's report could have easily been impeached by other evidence, including a finding in that report that King met one of the criteria for sexual predators. Moreover, the court observed that King had not been charged with being a sexual predator. In response to the motion, the prosecutor asserted that trial counsel's decision was tactical, and noted she had ample evidence with which to impeach King's character witnesses, none of whom was either an alibi witness or an eyewitness.

The trial court addressed King's motion at great length. It found that Whiting's or other character witnesses' testimony, all of which was intended to convey the view that King was, and had always been perceived by those who knew him well, as "a protector of women," could only have hurt his defense.[17]

The record reflects that trial counsel's decision not to call character witnesses was strategic. As the court observed, Whiting could easily have been impeached by statements in his own report. In addition, if King called other character witnesses to testify that, based on their knowledge of King, the prosecutor's version of what happened with Nicole was not likely to have happened, the prosecution may have been permitted to confront them with the evidence of the sexually explicit photographs recovered from King's computer. (Evid. Code, § 1102; *People v. Wagner* (1975) 13 Cal.3d 612, 618, 619 [119 Cal.Rptr. 457, 532 P.2d 105].) As many possible and reasonable tactical bases for defense counsel's actions exist, we must not speculate. King's claim of ineffective assistance must be rejected. (See *People v. Diaz, supra*, 3 Cal.4th 495, 557.)

Moreover, we return to the irrefutable point that King cannot show prejudice, given the overwhelming amount and nature of the evidence against

---

[16] At that time, the evidence under discussion involved sexually explicit photographs recovered from King's computer. The prosecutor stated she did not plan to introduce the photographs if King did not introduce character witnesses, and would bring the matter to the court's attention, if it became necessary. The photographs were never offered in evidence, and the matter was not raised again.

[17] Specifically, the trial court stated, "There were other impeaching things that were not brought out in the arguments, but that were brought out in the moving papers. [¶] [Y]ou have a character witness on the stand, and you let them know about this testimony and you say to them, 'If these things occurred, would it change your mind,' and they say, 'No,' then you know that it doesn't make any difference. They are going to stick with him no matter what. [¶] And if you say, 'If you knew these things would your opinion change,' and they say, 'Yes,' then it is not such a good witness."

him. He cannot establish that counsel's purportedly deficient performance resulted in prejudice to him to the extent that it undermined the proper functioning of the adversarial process, such that the proceeding cannot be relied upon to have produced a just result.

### (7) *Failure to submit pinpoint instructions*

King contends his trial counsel was ineffective in failing to request pinpoint instructions as to the limited purpose of Regina's testimony; the applicable standard for measuring consent; appropriately clarifying that a violation of LASPD policy was not necessarily a violation of law; and lesser included offenses.

We need not address these contentions. First, King cannot show he was prejudiced by any of these purported deficiencies. As stated above, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Strickland, supra,* 466 U.S. at p. 697; see *People v. Kipp, supra,* 18 Cal.4th at p. 366 ["If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient."].) King cannot show prejudice. The direct evidence against him was overwhelming and he cannot establish that but for counsel's performance, the result of the proceeding would have been different. Further, the substance of each specific contention of incompetence of counsel is addressed elsewhere. (See Discussion, pts. 1.b.(1) [Regina], 2.b.(2) [consent], 2.b.(1) [violations of LASPD policy] & 2.b.(3) [lesser included offenses].)

### (8) *Failure to object to religious testimony*

King maintains defense counsel was ineffective by failing to pose a specific objection to Nicole's testimony that she had been raised as a Catholic. We find no merit in this contention.

On direct examination, the prosecutor asked Nicole why she allowed a police officer to check her for weapons. She answered: "Because that's just how I was raised, to just listen to authority, especially police officers, given my culture and religion." The prosecutor then asked if she was Filipino and Catholic. Nicole confirmed that she was both, and that she had attended Catholic primary schools. In the first place, King's counsel *did* object to this testimony, contending it was irrelevant. The prosecutor responded that the evidence was relevant on the issue of "duress," and Nicole's relationship to King; the court overruled King's objection.

King also contends the prosecution exploited Nicole's religion to bolster her credibility. He maintains his trial counsel should have posed an objection

under Evidence Code section 789 which provides that evidence of "religious belief or lack thereof is inadmissible to attack or support the credibility of a witness." We cannot agree with King that the evidence of Nicole's religious upbringing was definitively offered in order to bolster her credibility. Rather, as the prosecutor stated, it was offered to provide context and help explain why Nicole, in whom the duty to defer to authority figures had been inculcated throughout her life, so readily complied with King's directives. The circumstances are not unlike those in *People v. Bautista* (2008) 163 Cal.App.4th 762 [77 Cal.Rptr.3d 824], in which evidence of religious beliefs was admitted. There, a lay minister of a small church sexually assaulted a young female member of the church by sexual penetration, under the ruse of "counseling" her and checking to see if she was still a virgin. The court in *Bautista* found no violation of Evidence Code section 789 because the evidence of religion was not admitted to attack any witness's credibility. Rather, it was admitted to provide "a context for defendant's actions and the [victim's] delayed reporting of the incidents" involving the sexual assault. (163 Cal.App.4th at p. 785.)

Here, an additional objection by defense counsel to Nicole's testimony under Evidence Code section 789 would have been futile. As in *Bautista*, Nicole's testimony was not admitted to bolster her credibility, but to provide context to explain why a grown woman in Nicole's position would readily cooperate with King. Nicole's Catholic upbringing was relevant and admissible on the issues of consent and whether she was under duress.

And, returning to the overarching issue of prejudice, even assuming error, King cannot show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694.) The evidence against King was overwhelming. There was substantial evidence, apart from Nicole's religious upbringing, to show that she did not consent and was under duress when King sexually assaulted her.

For all the reasons stated above, we reject King's contention that he was denied effective assistance of counsel or that, even if his counsel did err, that any such error, individually or cumulatively, prejudiced him such that his conviction must be reversed.

## 2. *Erroneous trial court rulings and incomplete instructions*

King contends the trial court erred by denying him the right to cross-examine Nicole regarding the content of her Web site, and also failed to properly instruct the jury as to all defense theories supported by the evidence.[18]

### a. *Cross-examination of Nicole*

During cross-examination, Nicole testified she plays in a band and goes by the name of "Paco." King contends he should have been permitted to cross-examine Nicole regarding statements on her "MySpace" Web page, that features a photo of a $10,000 bill and this statement by Paco: "By day I am a Panda Bear. By night I am a machine. Money is the root of all things." Paco's band's Web site identifies its record label as: "I fuck ya muther." When the prosecutor objected to this examination as irrelevant, King's counsel argued the evidence would show Nicole's motive "in terms of a possible lawsuit, trying to get money out of the police," and that she was not as naïve as she claimed to be.

The trial court found this evidence would be more confusing and prejudicial than relevant under Evidence Code section 352, and sustained the prosecution's objection. The court observed that, if Nicole had lied about what occurred, she would have been "a lot more scared from her testimony." And, if money had been her motive, she would have claimed that King "did more things." The court also noted that Marilyn, a completely independent witness, with nothing to gain and no relationship with any party, had seen King with his hand under Nicole's dress. The court permitted King's counsel, outside the presence of the jury, to question Nicole's monetary motives and ask if she had filed any lawsuits, and noted its willingness to revisit the issue if necessary.

When Nicole testified that she had called "411" that evening, rather than "911," because she had not viewed her situation as emergent and was "a little bit naïve," a sidebar ensued. The court instructed King's counsel not to make faces at the jury, as he had done when Nicole testified she was naïve, and asked him if that conduct related to "the $10,000." King's attorney said he did not believe Nicole was as naïve as she claimed to be. It was noted that Nicole had been a virgin at the time of the assault, and had just turned 21. The court observed that Nicole's testimony that she was naïve did not open the door to King's inquiry about her MySpace page. King's counsel requested

---

[18] King also contends the trial court erred in allowing Regina to testify. As discussed at part 1.b.(1), above, we agree, but conclude the error was harmless.

an opportunity to make a record on the matter. The court agreed and the MySpace page examination proceeded in chambers. Afterwards, the court permitted King to ask Nicole why she claimed to be naïve. Nicole responded that she was naïve about appropriate police procedures during a patdown or body search.

The issue was revisited later. Defense counsel reiterated his view that the MySpace evidence was relevant to Nicole's motive, and that her claim of naiveté had opened the door to examination of this evidence. He noted the Web page showed a woman, who appeared to be Nicole, "with a wad of what appears to be hundred dollar bills" in front of her. The court described the photo as someone holding money that said "Mary Kate and Ashley Olson." The court stated the issues in this case appeared unrelated to money, and the MySpace evidence was confusing and not relevant.[19] Defense counsel pointed out that "Paco's" band's Web site listed the record label as "I fuck ya muther." The court responded that the record label was not relevant, because this was not "a rape case where the issue is consent." The court also found "nothing wrong" with the photograph, but said again that it would reconsider its ruling regarding the evidence of the $10,000 bill if any evidence regarding Nicole's "money motive" arose.

■ "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. [Citation.]" (*Delaware v. Fensterer, supra,* 474 U.S. at p. 20; accord, *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674, 106 S.Ct. 1431].) The confrontation clause allows "trial judges . . . wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall, supra,* 475 U.S. at p. 679.) In other words, a trial court may restrict cross-examination on the basis of the well-established principles of Evidence Code section 352, i.e., probative value versus undue prejudice. (*People v. Harris, supra,* 47 Cal.3d at p. 1091.)[20] There is no Sixth Amendment

---

[19] The prosecution pointed out that Nicole's interest in money was reasonable, because her college major was economics or finance, and noted that the rock band in which "Paco" played was a Christian band.

[20] King's attempt to distinguish controlling authority is unavailing. For example, he concedes that, in *People v. Harris, supra,* 47 Cal.3d 1047, the Supreme Court found it was proper to restrict cross-examination before the jury. However, he claims that finding was only properly made after an Evidence Code section 402 hearing was conducted at which the witness testified he had not been offered any reward or immunity, and there was no offer of proof, threatened probation violation or other incentive to testify. (*Harris,* at pp. 1090–1091.) King concedes Nicole's Web site was an offer of proof, but asserts the restriction of questioning regarding her professed naiveté was too narrowly drawn. Although the trial court left the door open to King

violation at all unless the prohibited cross-examination might reasonably have produced a significantly different impression of credibility. (*People v. Rodriguez, supra,* 42 Cal.3d at pp. 750–751, fn. 2, limited on other grounds in *People v. Proctor* (1992) 4 Cal.4th 499, 538 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

King's Sixth Amendment right was not violated when the trial court prohibited defense counsel from cross-examining Nicole about her Web site. The content of the Web site was not relevant to the issues in the case. The photo and statements about money were not relevant because there was no evidence Nicole fabricated any part of the story of her assault. The name of the band's record label was similarly irrelevant, and Nicole's sexual knowledge or experience was not at issue in the case. Defense counsel was afforded ample opportunity to cross-examine Nicole and challenge her credibility. Specifically, when Nicole testified that she was "a little bit naïve," the court permitted defense counsel to ask why she was naïve, which Nicole explained.

Even if we were to assume the trial court erred, we would deem it harmless. King claims the error violated his constitutional rights. But the exclusion of impeaching evidence on collateral matters which has only slight probative bearing on the issue of veracity does not infringe on a defendant's right of confrontation. (*People v. Jennings* (1991) 53 Cal.3d 334, 372 [279 Cal.Rptr. 780, 807 P.2d 1009].) An ordinary error made under the evidentiary rules, which does not implicate federal constitutional rights, is reviewed under the reasonable probability standard of *People v. Watson, supra,* 46 Cal.2d at page 836. (*People v. Lawley, supra,* 27 Cal.4th at p. 155.) Here, as we have repeatedly observed, the evidence against King is overwhelming. There is Nicole's testimony and identification of King as the perpetrator. Then there is Marilyn, an independent eyewitness, who corroborated Nicole's testimony and identified King as the officer she observed with his hand under Nicole's dress. In light of this evidence, it is not reasonably probable that cross-examination of Nicole regarding the content of her MySpace page would have affected the outcome.

b. *Adequacy of jury instructions*

King contends that the trial court failed to properly instruct the jury in the following respects: (1) the jury was not instructed as to how to evaluate evidence of violation of LASPD policies; (2) the jury was not instructed that

---

to do so, he failed to offer any indication that Nicole had any motivation, particularly one driven by a desire for money or sexual knowledge or experience, to have lied about the incident. In *People v. Rodriguez* (1986) 42 Cal.3d 730, 748–749 [230 Cal.Rptr. 667, 726 P.2d 113], cross-examination was similarly restricted where no showing was made that a witness's teenaged drug use and psychological counseling were relevant to matters at issue.

it had to determine the question of whether Nicole was unlawfully restrained or whether she consented according to an objective standard; and (3) the court failed to instruct on lesser included offenses.[21] In determining the adequacy of jury instructions, we consider the entire charge of the court and assume jurors are intelligent people capable of understanding and correlating all the instructions given. (*People v. Harrison, supra,* 35 Cal.4th at p. 252.) An instruction is considered flawed only if there is " 'a reasonable likelihood that the jury misconstrued or misapplied the words' of the instruction. [Citation.]" (*People v. Wade* (1995) 39 Cal.App.4th 1487, 1491 [46 Cal.Rptr.2d 645].) Based on these well-established principles, we reject King's contentions of error.

### (1) *Evaluation of violations of LASPD policy*

King contends the trial court failed to instruct the jury on how to evaluate LASPD policy evidence. Specifically, King argues the jury should have been instructed that a violation of LASPD policy was not a violation of law. King does not propose and has never proposed how such an instruction would read. Nor can he show that the trial court's failure to give the unspecified instruction resulted in prejudice which so undermined the proper functioning of the adversarial process that the proceedings cannot be relied on to have produced a just result.

A court may only instruct as to correct statements of the law. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1275 [270 Cal.Rptr. 451, 792 P.2d 251], overruled on other grounds in *People v. Edwards* (1991) 54 Cal.3d 787, 835 [1 Cal.Rptr.2d 696, 819 P.2d 436].) It must not give confusing or argumentative instructions. (*People v. Benson* (1990) 52 Cal.3d 754, 805 [276 Cal.Rptr. 827, 802 P.2d 330].) Here, an instruction that "a violation of [LASPD] policy was not a violation of law" would only confuse the jury. The court properly instructed the jury on the definition of lawful detention (CALJIC No. 9.27) and the proper scope of a patdown search (CALJIC No. 16.109). The court instructed on sexual battery (count 1) in relevant part as follows: " 'Unlawful restraint' occurs when without consent a person's liberty is controlled by the words, act or authority of another. The means of the restraint need not be physical, but must consist of something more than simply the exertion of the physical effort required to commit the prohibited sexual act. A restraint is not unlawful if it is accomplished by lawful authority and for a lawful purpose, as long as the restraint continues to be for a lawful purpose." (CALJIC No. 10.37.) Thus, the jury was instructed, in effect, that compliance with LASPD policy (i.e., a restraint "accomplished by lawful

---

[21] King also asserts the court's instruction on the limited purpose of Regina's testimony was incomplete and confusing. We do not address this issue given our conclusion that Regina's testimony was erroneously admitted, but that the error was harmless.

authority and for a lawful purpose") was not a violation of law, or an "unlawful restraint." To further instruct that a violation of LASPD policy was not necessarily a violation of law would likely have been confusing to the jury.

Moreover, it is likely that King's trial counsel made the tactical decision not to focus on LASPD policies and procedures, in light of overwhelming evidence that King failed completely to comply with them. As stated above, appellate courts are reluctant to second-guess decisions made at trial unless there simply is no plausible or satisfactory explanation for the purportedly deficient performance. (*People v. Kipp, supra,* 18 Cal.4th at p. 366.)

In any event, any error was harmless under *People v. Watson, supra,* 46 Cal.2d at page 836. (*People v. Wharton* (1991) 53 Cal.3d 522, 571 [280 Cal.Rptr. 631, 809 P.2d 290] [applying *Watson* to failure to give pinpoint instruction].) The jury received instruction on the necessary elements of each crime. No claim was made that King was guilty of any charged crime because he violated LASPD policy. The evidence against King was overwhelming. It is not reasonably probable he would have received a better result had the jury been specifically instructed that LASPD policy was not law.

### (2) Consent

Relying on *Florida v. Jimeno* (1991) 500 U.S. 248 [114 L.Ed.2d 297, 111 S.Ct. 1801], King contends the trial court should have instructed the jury to use an objective standard to evaluate whether Nicole was unlawfully restrained or whether she consented to the search. He maintains, "[t]he jury had to determine if it was objectively reasonable for [King] to believe he could search, based upon [Nicole's] spoken words." King is wrong.

First, *Jimeno* governs the issue of consent and scope of a search in the context of a search and seizure case under the Fourth Amendment. It does not apply here. (*Florida v. Jimeno, supra,* 500 U.S. at p. 251.) This case involves consent in forcible sexual assault, which, under California law, is codified at section 261.6. (*People v. Giardino* (2000) 82 Cal.App.4th 454, 459–460 [98 Cal.Rptr.2d 315].) That statute states, "[i]n prosecutions under Section 261, 262, 286, 288a, or 289, in which consent is at issue, 'consent' shall be defined to mean positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." The instruction given to the jury reflected the language contained in section 261.6.

The question was not whether it was "objectively reasonable" for King to believe Nicole consented.[22] The issue was whether Nicole "acted freely and voluntarily" in an "exercise of free will" and in "positive cooperation." The jury had to determine whether the "permission" Nicole gave to King to proceed with his invasive "search" constituted "consent that [was] actually and freely given without any misapprehension of material fact." (*People v. Giardino, supra*, 82 Cal.App.4th at p. 460; cf. *People v. James* (1977) 19 Cal.3d 99, 106–107 [137 Cal.Rptr. 447, 561 P.2d 1135] [in search and seizure case, prosecution was required to prove that defendant's manifestation of consent was the product of free will, not merely the submission to an express or implied assertion of authority, and voluntariness of consent is in every case " 'a question of fact to be determined in the light of all the circumstances' "].) Here, the jury was properly instructed, by virtue of its receipt of CALJIC No. 1.23.1, that to find consent it had to find Nicole's acquiescence to the search was actually and freely given, and that she was not under any misapprehension of material fact. The jury was not erroneously instructed on the issue of consent.

### (3) *Lesser included offenses*

King contends the trial court erred in failing to instruct on lesser included offenses because misdemeanor sexual battery (§ 243.4, subd. (e)) is a lesser included offense of all the charged offenses. We disagree.

 The trial court must instruct the jury on necessarily included offenses if there is substantial evidence that one or more elements of the charged offense is missing. (*People v. Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913], overruled on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142, 175 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) This duty arises even if the defendant fails to request the instructions or, as here, objects to them as a matter of trial tactics. (*People v. Barton* (1995) 12 Cal.4th 186, 195 [47 Cal.Rptr.2d 569, 906 P.2d 531].) "Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense." (*People v. Sedeno, supra*, 10 Cal.3d 703, 716.)

"An offense is necessarily included in another if (1) the greater statutory offense cannot be committed without committing the lesser because all of the elements of the lesser offense are included in the elements of the greater; or

---

[22] A defense that a defendant mistakenly but in good faith believed the victim consented includes an objective component that the defendant's mistaken belief was "reasonable under the circumstances." However, King did not raise this defense at trial, and it is not at issue on appeal. (*People v. Williams* (1992) 4 Cal.4th 354, 361 [14 Cal.Rptr.2d 441, 841 P.2d 961].)

(2) if the charging allegations of the accusatory pleading include language describing it in such a way that if committed in that manner the lesser offense must necessarily be committed. [Citations.]" (*People v. Clark* (1990) 50 Cal.3d 583, 636 [268 Cal.Rptr. 399, 789 P.2d 127].) However, even if an offense is a lesser included offense under this test, a court may refuse the instruction if there is insufficient evidence that the offense committed, if any, was less than that charged. (*People v. Duncan* (1991) 53 Cal.3d 955, 970 [281 Cal.Rptr. 273, 810 P.2d 131].)

Misdemeanor sexual battery (in violation of § 243.4, subd. (e)) requires a showing that the defendant touched an intimate part of another person, the touching was against that person's will, and was done with specific intent to cause sexual arousal, gratification or abuse. (CALJIC No. 16.145.) Misdemeanor sexual battery is a lesser included offense of sexual battery by restraint. (§ 243.4, subd. (a).)

We need not reach the issue of whether misdemeanor sexual battery is a lesser included offense of the sexual penetration offenses under section 289. Even if we assume that sexual battery is a lesser included offense of genital penetration, we conclude there is no substantial evidence from which a reasonable jury could conclude that the offenses committed were less than those charged. As discussed above, there was bountiful, uncontradicted evidence that Nicole was unlawfully restrained when King detained her and held her hands behind her back while he touched her breasts (count 1), and that he sexually penetrated her vagina twice with each of his hands (counts 2–5). Under these circumstances, it would be unreasonable to conclude that the lesser offense of sexual battery occurred but that the greater offense of vaginal penetration did not. No instruction on a lesser included offense was required. If the jury believed Nicole and Marilyn, the elements of section 289, subdivision (g) were established. On the other hand, if the jury credited King's defense that Nicole consented, then he was entitled to acquittal. If King was guilty at all, he was guilty of sexual penetration. "A trial court need not . . . instruct on lesser included offenses when the evidence shows that the defendant is either guilty of the crime charged or not guilty of any crime . . . ." (*People v. Barton, supra,* 12 Cal.4th at p. 196, fn. 5.)

Finally, even if we assume error, we find it was harmless under *Watson.* (See *People v. Breverman, supra,* 19 Cal.4th at p. 176.) As discussed above, evidence against King was overwhelming. It is not reasonably probable he would have received a better result had the trial court also instructed on the lesser included offense of sexual battery.

### 3. *Sufficiency of the evidence*

King contends the evidence was insufficient to support his convictions. He argues that Nicole consented to the touching and that there was no evidence of force or threat. As abundantly clear from our discussion above, we do not agree.

On review of a claim of insufficient evidence, we ask "whether ' "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1], italics omitted.) The evidence upon which the judgment relies must be "reasonable, credible, and of solid value." (*People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].) It is not our role to reweigh evidence or evaluate the credibility of the witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) When a verdict is supported by substantial evidence, we defer to the trial court's findings.

Sexual battery (count 1) under section 243.4, subdivision (a), requires proof that "[t]he touching was against the will of the alleged victim," who is "unlawfully restrained by the accused." (CALJIC No. 10.37.) Forcible sexual penetration by a public official (counts 2 and 4) under section 289, subdivision (g), requires proof that "[t]he act was accomplished against the will of the alleged victim by threats to use the authority of a public official to [incarcerate] [or] [arrest] . . . [the alleged victim] . . . ." (CALJIC No. 10.35.) Forcible sexual penetration (counts 3 and 5) under section 289, subdivision (a)(1), requires proof that "[t]he sexual penetration was against the will of the alleged victim" and "accomplished by [the use of force [or] duress . . . .]" (CALJIC No. 10.30.)

"Consent" as noted above, requires "positive cooperation in an act or attitude as an exercise of free will." (CALJIC No. 1.23.1; see Pen. Code, § 261.6.) "Duress" is "a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which [she] would not otherwise have performed, or acquiesce in an act to which [she] otherwise would not have submitted. The total circumstances, including the age of the alleged victim, and his or her relationship to the . . . [defendant], are factors to consider in appraising the existence of the duress." (CALJIC No. 10.30.) Force is used in sexual crimes when "a person uses enough physical force to overcome the other person's will." (CALCRIM No. 1045.)

As the jury found and as amply reflected in this record, Nicole did not consent to King's touching her breasts or penetration of her vagina; she

never "act[ed] freely and voluntarily." She cooperated with King when he pulled her over, asked her to park on an isolated side street in an unknown area, and took her driver's license because she believed he was an LAPD officer, and she knew she had made an illegal U-turn. When he said he had to conduct a sobriety test, Nicole continued to cooperate because she knew she had recently consumed a beer. Once she got out of the car, King neglected the sobriety test for a time, and asked if Nicole had any weapons. Finding none in her jacket, he proceeded to pat her down for weapons and drugs. He never asked her permission before the patdown, nor did he call for the assistance of the female officer on duty that night to conduct the search. Further, King, an imposing figure much taller than and about twice as heavy as Nicole, held both her hands behind her back throughout the search. Under these circumstances, Nicole was in no position to refuse an authoritative King when he asked to "check her breasts" or search her vagina for drugs. Her "cooperation" was nothing beyond "mere submissiveness," not a "positively displayed willingness to join in the sexual act," or a free and voluntary act. (*People v. Bermudez* (1984) 157 Cal.App.3d 619, 624 [203 Cal.Rptr. 728] ["The law [on consent] has outgrown the resistance concept; a person demanding sexual favors can no longer rely on a position of strength which draws no physical or verbal protest."]; see *People v. Giardino, supra,* 82 Cal.App.4th 454, 460, fn. 3 ["Actual consent must be distinguished from submission."].)

The record also contains substantial evidence Nicole was unlawfully restrained. Unless the circumstances are exigent, LASPD policy requires that female officers conduct searches of female arrestees for weapons where necessary. Here, under the guise of conducting a cursory search for weapons which, by law, must be limited to a person's "outer clothing" (CALJIC No. 16.109), King massaged and cupped Nicole's bare breasts with both hands, and alternately inserted the fingers of each of his hands into her vagina to "dig around." King said he was looking for drugs, but there was no evidence Nicole was under the influence of drugs or involved in drug-related activity. King's restraint of Nicole while he fondled and digitally penetrated her was unlawful.

In addition, there was substantial evidence that King's crimes were committed by the use of force or duress, and threat of incarceration or arrest. After stating that she made an illegal U-turn, that he had already run her plates and would have to give her an FST, and leaving her alone a few minutes in order to heighten her discomfort, King artificially escalated the seriousness of the situation—after first ensuring that Nicole was unfamiliar with proper police procedures for field searches—by telling Nicole he needed to pat her down for weapons. He escalated the situation further by claiming he had to search for drugs. He held her hands behind her back during the patdown and asked to search her breasts and vagina. Simply by virtue of his restraint and position of authority, there was an implied threat of hardship or

retribution if Nicole refused to cooperate. Nicole complied because she was afraid and felt she had no choice, and King restrained her hands while he touched her breasts and penetrated her vagina. After conducting an ineffectual FST, King then verbalized his previously veiled threat by asking Nicole how she knew he would not "arrest [her] or give [her] a ticket?" Under these circumstances, King's crimes were accomplished by the use of force, duress, and a threat of incarceration or arrest.[23]

### 4. Sentencing

#### a. Mitigating versus aggravating factors

King contends multiple mitigating factors set forth in California Rules of Court, rule 4.423,[24] such as the fact that his prior record was insignificant (two misdemeanors committed when he was 19 and 21 years old), for which he had satisfactorily completed probation (rule 4.423(b)(6)), and the fact that his convictions on two counts of section 289, subdivision (a) rendered him ineligible for probation (§ 1203.065, subd. (a).; rule 4.423(b)(4)), outweighed the single "legitimate" factor in aggravation—he took advantage of a position of trust or confidence to commit the offense. (Rule 4.421(a)(11).) Accordingly, under the Fifth and Sixth Amendments, he contends a mitigated term was required.

 Trial courts need not state reasons for rejecting or minimizing a mitigating factor, particularly where no objection is raised. (*People v. Holguin* (1989) 213 Cal.App.3d 1308, 1317 [262 Cal.Rptr. 331]; *People v. Lamb* (1988) 206 Cal.App.3d 397, 401 [253 Cal.Rptr. 465].)[25] "Further, unless the record affirmatively indicates otherwise, the trial court is deemed to have considered all relevant criteria, including any mitigating factors." (*People v. Holguin, supra*, 213 Cal.App.3d at pp. 1317–1318.)

King's contention notwithstanding, several aggravating circumstances were involved here. First, "[t]he manner in which the crime was carried out indicates planning, sophistication, or professionalism . . . ." (Rule 4.421(a)(8).) Although King happened upon Nicole only after she became

---

[23] To support his claim that Nicole consented, King points to Nicole's testimony that she was not afraid of him and did not think he would attack her. He neglects, however, to mention that this testimony was elicited regarding Nicole's state of mind after the search had ended, and she was back in her car and headed home. Nicole testified repeatedly that she was afraid and nervous throughout her encounter with King, and did not tell him to stop because she felt she had no choice.

[24] Further references to any "Rule" are to the Rules of Court.

[25] King acknowledges that trial courts need not state reasons for imposing an upper term. (§ 1170, subd. (b); *People v. Sandoval* (2007) 41 Cal.4th 825, 843–845 [62 Cal.Rptr.3d 588, 161 P.3d 1146].) His argument is made primarily to preserve it for review.

lost, once he found her his assault was sophisticated, well planned and purposeful. He made sure Nicole moved to an isolated spot, across from a school he knew was closed, led her to believe the stop was legitimate by taking her driver's license and claiming to have run her plates, and ascertained that she was not familiar with proper police procedures for body searches. In addition, King never reported the traffic stop or his location to LASPD dispatch, facts which indicate he planned from the outset to conceal his location and activities.

Moreover, King's "victim was particularly vulnerable," the crimes were especially callous, and King betrayed his position of public trust and confidence to commit the offense. (Rule 4.421(a)(1), (3), (11).) Acting as a police officer when the assault occurred, King exploited his position of public trust and authority to prey on and manipulate Nicole who was lost, alone and afraid, as well as trusting and naïve. He isolated and exerted complete control over a young woman, virtually half his size, in the middle of the night in an area completely unfamiliar to her. He took advantage of his position of public authority to violate her trust and the public trust, and assault and humiliate her on a public street, and continued doing so even after he knew at least one person may have seen him.

### b. Concurrent terms

The trial court has broad discretion with regard to sentencing, and its decision will be affirmed on appeal, so long as it is not arbitrary or irrational and is supported by any reasonable inferences from the record. (*People v. Lamb, supra*, 206 Cal.App.3d at p. 401.) The party attacking the sentence must show the sentencing decision was irrational or arbitrary and if it fails to do so, " 'the trial court is presumed to have acted to achieve legitimate sentencing objectives . . . .' " (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977–978 [60 Cal.Rptr.2d 93, 928 P.2d 1171].)

King contends the trial court was required to impose concurrent terms under rule 4.425 because the crimes lacked independent objectives and were committed at the same time and place, there were no actual implicit threats or acts of violence of the crimes, and the aberrant behavior lasted only a short time. He acknowledges that "other mitigating or aggravating circumstances can be used" under rule 4.425, subdivision (b), but the entirety of his argument on this point is that "these circumstances call for a mitigated, and concurrent sentence." This bare, unsubstantiated assertion does not approach the level of proof necessary to satisfy King's burden on appeal.

Only one criterion is necessary to impose a consecutive sentence. (*People v. Bishop* (1984) 158 Cal.App.3d 373, 382–383 [204 Cal.Rptr. 502].)

Any of several factors, including King's planning, which indicates premeditation and sophistication, the vulnerability of his victim, his abuse of his position of trust, or the callousness of the crime may serve as a sufficient basis for imposing a consecutive term. The court chose to give separate consecutive sentences in part because "this defendant, with his background, experience, knowledge and the circumstances, had an opportunity to stop. The car is gone. Feels the coast is clear. No one else was there and he decides to humiliate her another time. [¶] So the court would choose to give a separate full consecutive sentence . . . ." This was not an abuse of judicial discretion.

### c. Violent sex crimes

King contends the consecutive sentencing on four qualifying convictions (counts 2–5) violated his rights under the Fifth and Sixth Amendments because the jury was not instructed to decide, and did not decide, if the offenses took place "on separate occasions" as defined in section 667.6, subdivision (d). That provision provides in relevant part: "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

King contends that, because no jury made factual findings as to whether the four offenses took place "on separate occasions," pursuant to *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], mandatory consecutive sentences are prohibited, as a violation of his right to jury trial. However, the United States and California Supreme Courts have held that the decision whether to run individual sentences consecutively or concurrently does not implicate the Sixth Amendment right to jury trial. (*Oregon v. Ice* (2009) 555 U.S. 160, ___ [172 L.Ed.2d 517, 522, 129 S.Ct. 711, 714–715]; *People v. Black* (2007) 41 Cal.4th 799, 820–823 [62 Cal.Rptr.3d 569, 161 P.3d 1130].)

King maintains concurrent sentences were in order because the crimes did not take place on separate occasions and occurred within two minutes, thus not providing a meaningful opportunity for reflection.

Section 667.6 requires consecutive terms for each violation of certain sex crimes (including § 289, subds. (a) & (g)), "if the crimes . . .

involve the same victim on separate occasions." (§ 667.6, subd. (d).) A finding that the defendant committed the sex crimes on separate occasions "does not require a change in location or an obvious break in the perpetrator's behavior." (*People v. Jones* (2001) 25 Cal.4th 98, 104 [104 Cal.Rptr.2d 753, 18 P.3d 674].)[26] Once the trial court has found, under section 667.6, subdivision (d), that a defendant committed the sex crimes on separate occasions, we will reverse "only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092 [132 Cal.Rptr.2d 831].)

Here, the trial court specifically determined that King, who sexually assaulted Nicole under the ruse that he was performing a lawful search, used the fingers of one hand to penetrate Nicole's vagina. When he saw lights and a car drove by, he momentarily paused to look around uneasily, and then reinserted the fingers of his other hand in a separate assaultive act. The court observed the fact that King "removed his finger when the lights went by. He looked uneasy; showing he knows what he's doing was wrong." And, later, the court reiterated that, once King "noticed the lights of Marilyn's car . . . he removed his fingers, looked around and looked uneasy. He could have stopped at that point. This was the opportunity giving [King] the opportunity to reflect about his actions. [¶] After the coast was clear, this intelligent experienced man then decided to re-insert a finger with his other hand for about another 25 seconds." Accordingly, the court specifically found "that this qualifies for a separate full consecutive term."

---

[26] *Jones* refers favorably to *People v. Irvin* (1996) 43 Cal.App.4th 1063 [51 Cal.Rptr.2d 127], which held that "a forcible violent sexual assault made up of varied types of sex acts committed over time against a victim, is not necessarily one sexual encounter." (*Id.* at p. 1071). In *Irvin*, the defendant was sentenced to consecutive terms for each of 20 sex crimes after the trial court found he had an opportunity to reflect on his actions, stopped, conversed, caught his breath, then proceeded with another violent sex crime, moving from room to room. The appellate court remanded for resentencing, noting the trial court had not provided an adequate explanation as to why the facts allowed it to determine all 20 sex crimes had to have occurred on separate occasions. (*Id.* at p. 1070.) *Irvin* took issue with the reasoning in *People v. Pena* (1992) 7 Cal.App.4th 1294, 1316 [9 Cal.Rptr.2d 550], *People v. Corona* (1988) 206 Cal.App.3d 13, 18 [253 Cal.Rptr. 327], and *People v. Plaza* (1995) 41 Cal.App.4th 377 [48 Cal.Rptr.2d 710], each of which had suggested a change in location or obvious break in a defendant's activity was necessary. (*Irvin*, at pp. 1070–1072.)

The *Irvin* court found that violent sexual acts should not be viewed through the same lens as consensual sexual acts: "Consensual sex may include times when the participants go back and forth between varied sex acts, which they consider to be one sexual encounter. By contrast, a forcible violent sexual assault made up of varied types of sex acts committed over time against a victim, is not necessarily one sexual encounter. Such a sexual assault . . . is not motivated by sexual pleasure. Instead, it is frequently intended to degrade the victim. . . . Therefore, at sentencing a trial court could find a defendant had a 'reasonable opportunity to reflect upon his or her actions' even though the parties never changed physical locations and the parties 'merely' changed positions." (*Irvin, supra*, 43 Cal.App.4th at p. 1071.)

The court went on to state that, even if consecutive sentences were not mandated, under the circumstances of the case, based on King's breach of his position of trust and authority, the humiliation he inflicted upon Nicole, and King's intelligence, background, experience, knowledge and the fact that he had an opportunity to stop—and chose not to—it would exercise its discretion to impose separate full consecutive sentences. On this record, we cannot say "no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*People v. Garza, supra*, 107 Cal.App.4th at p. 1092.) We find no error in the sentence imposed.

## DISPOSITION

The judgment is affirmed.

Rothschild, Acting P. J., and Chaney, J., concurred.

A petition for a rehearing was denied May 17, 2010, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 11, 2010, S183041. George, C. J., did not participate therein.