Filed 10/14/21  P. v. Catarino CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078832 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. C1635441) |
| EDGAR SANDOVAL CATARINO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Santa Clara County, Cynthia A. Sevely, Judge.  Affirmed and remanded for resentencing.

Ron Boyer, under appointment by the Court of Appeal, for Defendant and Appellant David Olvera.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Donna M. Provenzano and Melissa A. Meth, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Edgar Sandoval Catarino of six counts of forcible lewd acts on a child under 14 and one count of attempted forcible lewd act on a

child under 14.  The trial court sentenced Catarino to 35 years and six months in prison.

On appeal, Catarino argues the trial court prejudicially erred by allowing expert testimony on the statistical prevalence of false allegations of sexual abuse by children.  He also asserts the court committed various errors in sentencing.  Specifically, he contends (1) there was insufficient evidence to support the court's finding of separate instances of abuse requiring consecutive sentences under Penal Code section 667.6, subdivision (d);[1] (2) under the Sixth Amendment, that finding was required to be made by a jury, not the trial court; and (3) the court applied the wrong legal standard to its finding.  Additionally, Catarino argues, and the Attorney General concedes, that the court erred by sentencing Catarino's attempt conviction under section 667.6, subdivision (d).  We agree with the parties that the court erred by sentencing the attempt conviction under section 667.6, subdivision (d), but reject each of Catarino's other appellate contentions.  Accordingly, we affirm the judgment and remand for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

On November 8, 2017 the Santa Clara County District Attorney charged Catarino with eight counts of forcible lewd acts on a child under 14.  The information alleged that Catarino molested his nine-year old cousin, B. Doe, eight separate times between June 8, 2015 and March 9, 2016 in violation of section 288, subdivision (b)(1) (counts 1 through 8).  The case was brought to trial the following year.

A. *The Prosecution's Case*

At trial, the prosecution called Doe, her younger sister, and her parents to testify about the molestation.  Doe's mother, Angelica V., explained that

---

[1]    Subsequent undesignated statutory references are to the Penal Code.

2

her husband is the brother of Catarino's mother and she is the sister of Catarino's father. The two families were extremely close before the molestation and the families lived next door to one another. When Doe was in fourth grade, she and her sister would go to the Catarino's house after school twice a week to be watched by Catarino's mother or his girlfriend, Laura D., while the girls' parents worked. In February 2016 of that year, when Angelica was about to drop her daughters at the Catarino home, Doe told Angelica that she did not want to go because Catarino would do naughty things to her.

After Doe told her mother about the abuse, Angelica and Doe's father, Pedro V., convened a meeting with Catarino and his family. Doe and her sister were not included but were being watched in the house by Laura in another room. At the meeting, Catarino denied the accusations made by Doe. Catarino's parents also did not believe Doe. Doe's parents left the meeting in anger. When Angelica and Pedro returned an hour later, Catarino was asking for Doe's forgiveness and he and his family were comforting her.

Thereafter, Doe's parents contacted the police and Doe was interviewed by Sugey Jaimez, a sheriff's office sergeant trained in child forensic interview techniques. The interview was recorded and played for the jury. Doe also testified at trial about the molestation. She told the jury that all of the incidents occurred in Catarino's bedroom. In describing the first incident, Doe stated that Catarino stood behind her, grabbed her by the waist, and put his hands under her clothing. Doe stated he touched her chest and her vagina under her clothes. Doe also testified that she could feel Catarino's penis on her buttocks. During her trial testimony and her interview with Jaimez, she stated that Catarino moved back and forth "like a worm." Doe stated she was scared and tried to push Catarino away.

3

After this first incident, there were other times Catarino stood behind Doe and moved in a way that she felt his penis. Doe testified that it happened more than twice. Doe also told Jaimez that Catarino would rub her vagina, which she called "pineapple," "like a hurricane" and "squish" it. Doe said that Catarino usually did not try to take off her underwear, but he would "dig in" to her vagina. He touched her vagina over her clothes more than once. Doe also testified that in a separate incident Catarino pulled her pants partway down her legs. She pulled them back up and he tried to pull them down again. In another separate incident, Catarino put his hand under Doe's shirt and touched her bra. He tried to "squish" her breasts.

During the interview with Jaimez and at trial, Doe stated that the last incident of abuse she remembered took place during a birthday party for Catarino's mother. It was late, and Doe went to lie down in Catarino's bedroom. When she woke up, Catarino was in the room. Catarino walked toward the bed and bit Doe on her upper chest. It hurt and left a mark. Doe testified that Catarino had bit her on the chest on two occasions. Angelica testified that she had once noticed a bite mark on Doe's chest, but at the time she did not know it was caused by Catarino.

In each of the different instances of abuse, Doe was scared and she tried to fight off Catarino. Catarino told Doe not to tell anyone about his actions or he would get her in trouble, and said he would not let her play video games on his PlayStation, something nine-year-old Doe cared about. Because of Catarino's threats, Doe was scared to tell her mother.

Dr. Blake Carmichael testified for the prosecution as an expert in Child Sexual Abuse Accommodation Syndrome (CSAAS). Dr. Carmichael was not familiar with the facts of this case and did not speak to any of the other witnesses. Dr. Carmichael described CSAAS as a group of concepts used to

4

educate people about sexual abuse, specifically the myths and misconceptions that many people hold about how a child should react to abuse perpetrated on them. In his testimony, Dr. Carmichael explained that there are five aspects to CSAAS: secrecy; helplessness; entrapment or accommodation; delayed, conflicted or unconvincing disclosure; and retraction.

Dr. Carmichael testified that secrecy relates to the dynamic of how sexual abuse occurs, typically in private by a person with whom the victim has an ongoing relationship. This dynamic often inhibits the child victim from reporting the abuse because he or she does not want to ruin the relationship (or related family or friend relationships) by causing the perpetrator to be in trouble. Dr. Carmichael next explained that helplessness describes the vulnerability a victim feels when the abuse is perpetrated by someone who should be protecting them. According to Dr. Carmichael, helplessness inhibits a victim from reporting.

Dr. Carmichael explained that entrapment and accommodation involve the coping mechanisms children employ to deal with abuse, including disassociating during the abuse, becoming fearful of the abuser, or counter-intuitively continuing to have loving and caring feelings for the abuser. The fourth aspect of CSAAS—delayed, conflicted, or unconvincing disclosure—relates to the fact that most child victims will not disclose the abuse right away, or the disclosure will occur incrementally. Similarly, a child victim's inability to accurately remember details or chronology can create a perceived inconsistency in their narratives. Dr. Carmichael explained that because of the way memory works, it is more common for a child to omit details of the abuse than make up events. During this portion of his testimony, Dr. Carmichael testified that several published studies of false allegations of child sexual abuse showed a range of two to five percent of allegations were

5

false.  Finally, Dr. Carmichael explained the concept of retraction relates to the fact that children will sometimes deny earlier, truthful accounts of abuse.

B. *The Defense Case*

Catarino testified in his own defense.  He stated he would wrestle with Doe and her younger sister, but categorically denied abusing Doe.  Catarino testified he would help Doe play video games, with her sitting on his lap, and he told the jury he had on occasion spanked Doe when she misbehaved.  He didn't recall his penis ever touching her or him touching her chest or vagina, but if it occurred it would have been accidental while they were playing.  Catarino testified that he thought Doe was angry at him for scolding her about homework and that she made up the allegations to punish him.

Laura also took the stand.  She testified that she had warned Catarino not to wrestle with Doe and her sister in the manner he did because the girls were too old for it, and she thought it was inappropriate.  She also stated that Doe had complained once that Catarino had touched her chest.  However, she had never seen Catarino act in a sexually inappropriate or violent way towards Doe or any other child.  She had no recollection of Doe ever being angry at Catarino.  Laura also testified that Doe was not fearful of Catarino and had interacted with him normally at two family gatherings after reporting the abuse to her mother.  Finally, Laura testified that Doe had watched soap operas and other television shows with mature themes, including molestation.

The defense also called Catarino's father, Catarino's younger brother, Catarino's aunt (who was also Doe's aunt), two close friends, and Laura's mother, who all testified they had never seen Catarino acting inappropriately towards Doe or other children, and that Catarino was not the type of person who would molest a child.  One friend testified that after the allegations were

made, she observed Doe interacting with Catarino at a family party and Doe hugged Catarino and did not seem scared of him. Catarino's father also testified that Doe did not seem scared of Catarino or to dislike him. Catarino's brother stated that he saw a slight change in Doe's demeanor after she told her mother about the abuse, in that she was more reserved and "trying to be normal."

C. *Conviction and Sentencing*

The jury found Catarino guilty on counts 1 through 6 of forcible lewd act on a child under age 14. On count 7, the jury found Catarino guilty of the lesser included offense of attempted forcible lewd act on a child under 14. The jury acquitted Catarino on the eighth count. Thereafter, the court sentenced Catarino to 35 years and six months in prison, consisting of the middle term of eight years on count 1, the lower term of five years on counts 2 through 6, and the lower term of two years and six months on count 7, with the full terms running consecutively pursuant to section 667.6, subdivision (d). Catarino timely appealed.

DISCUSSION

I

Catarino asserts the court prejudicially erred by allowing Dr. Carmichael to testify that published studies have shown false allegations of child molestation are rare. The Attorney General concedes admitting the testimony was error, but argues that it was not prejudicial.

A

Before trial, the prosecutor moved in limine to admit expert testimony concerning CSAAS. Catarino sought to limit CSAAS testimony to dispelling actual myths or misconceptions about child sexual abuse, and opposed any testimony or evidence related to statistics concerning false child sexual abuse

allegations. At the motions in limine hearing, the trial court ruled that expert testimony on CSAAS would be allowed but failed to rule on the question of statistics of false allegations.

During Dr. Carmichael's testimony, Catarino's counsel objected to his statement that "a number of research articles [have] shown somewhere between 40 and 60 percent of [victims] don't tell [about the abuse] within the first year" after it occurs. The objection led to a sidebar conversation and additional argument about whether Dr. Carmichael would be permitted to testify about research showing false allegations of abuse were uncommon. Catarino's counsel asserted that such testimony was impermissible because the expert would be substantiating the truthfulness of the testifying victim. The prosecutor responded that the testimony was permissible because it was not specific to the facts of the case. The court allowed the testimony and indicated it would provide a limiting instruction to the jury.

Dr. Carmichael then testified about three studies concerning the prevalence of false allegations of abuse. He stated he was familiar with a study from 2006 "of over 9,000 cases of child maltreatment" in which 1,000 of the incidents involved sexual abuse. Dr. Carmichael testified that of those 1,000 cases, none were found to involve false allegations by children, though some involved false allegations by parents. Dr. Carmichael then discussed two additional studies, one on "the eastern seaboard" and one from the Denver social services department, that had shown the rate of false allegations of abuse by children was between two and five percent.

In his rebuttal closing, the prosecutor referred to this testimony, stating "I want to talk about Dr. Carmichael briefly just because it was brought up just a moment ago, and [Catarino's counsel] mentioned Dr. Carmichael told you false accusations do occur. Sort of. He talked about

8

a study that had 9,000 cases and it was reported at zero percent. So I guess you could say there are false allegations. He did talk about that. It's a fact that they do exist, a percentage. I think the highest number he mentioned was five percent."

B

Prosecutors often elicit testimony concerning CSAAS in cases involving child sexual abuse. Such "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is[, however,] admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301.)

After the trial in this case, two courts of appeal held that expert testimony involving statistical evidence of false allegations is inadmissible at trial. (*People v. Julian* (2019) 34 Cal.App.5th 878, 887 (*Julian*); and *People v. Wilson* (2019) 33 Cal.App.5th 559, 570 (*Wilson*).) *Wilson*, which collected cases from around the country, observed "the clear weight of authority in our sister states, the federal courts, and the military courts finds such evidence inadmissible." (*Wilson,* at pp. 568–570.) Such testimony, *Wilson* concluded, has "the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth." (*Ibid*.) "In so doing, this testimony invade[s] the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the

evidence.' " (*Ibid*.)  We agree with this reasoning, and accept the Attorney General's concession that the admission of the testimony was error.  (See also *People v. Collins* (1968) 68 Cal.2d 319, 327 ["the prosecution's introduction and use of mathematical probability statistics" constituted a "fundamental prejudicial error" because "it distracted the jury from its proper and requisite function of weighing the evidence on the issue of guilt" (*Collins*).)

Thus, the critical questions remaining are the appropriate standard of review and whether the error was prejudicial.  We conclude that the error is not one of federal constitutional dimension, as Catarino contends.  Rather, the error should be evaluated under the state law standard of *People v. Watson* (1956) 46 Cal.2d 818, 836.  " 'The admission of evidence results in a due process violation only if it makes the trial fundamentally unfair. [Citation.]  "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citation.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." ' " (*People v. Coneal* (2019) 41 Cal.App.5th 951, 972.)  Catarino has not established that Dr. Carmichael's relatively brief testimony on the occurrence of false allegations rendered his trial fundamentally unfair.

Although the testimony supported a finding that Doe was a truthful witness, it is not the only inference the jury could have drawn.  It is conceivable the jury may have inferred that false allegations occur, but are not well documented in the research, or that Dr. Carmichael was unaware of all research on the topic.  The testimony also acknowledged that false accusations do occur.  Thus, the prejudice standard governing errors of state law applies.  (*Wilson, supra*, 33 Cal.App.5th at pp. 571–572.)

10

Further, "[i]n similar situations … our high court has applied" the *Watson* standard, "under which we reverse only if it is reasonably probable the defendant would have reached a more favorable result in the absence of the error." (*Wilson*, 33 Cal.App.5th at p. 571, citing *People v. Bledsoe* (1984) 36 Cal.3d 236, 251–252 [applying *Watson* standard where evidence of rape trauma syndrome erroneously admitted to prove victim was actually raped]; *Collins, supra*, 68 Cal.2d at pp. 331–332 [applying *Watson* standard where " 'trial by mathematics' so distorted the role of the jury"]; see also *People v. Prieto* (2003) 30 Cal.4th 226, 247 ["The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' "].)

C

Under the *Watson* standard, we conclude the error was not prejudicial. Dr. Carmichael's testimony on the statistical evidence was limited, consisting of just two pages of transcript, and the prosecutor mentioned the evidence only briefly in his rebuttal closing argument. Critically, here, both the victim and the defendant testified extensively, allowing the jurors to directly assess their credibility. As the Attorney General points out, Doe had no motive to lie and every motive to keep the abuse secret and preserve the close family relationship between her immediate family and Catarino's family. Doe was generally very consistent in her descriptions of the incidents of molestation. She also used language appropriate to her young age and gave detailed accounts of Catarino's conduct.

In contrast, Catarino admitted he might have touched Doe inappropriately during their play and his girlfriend Laura stated she had seen this occur. Catarino's explanation that Doe was mistaken about his

11

contact with her did little to counteract her detailed description of the abuse. While Doe was confused by some of the questions asked by Catarino's counsel during cross-examination, she was clear that she understood the difference between a truth and a lie. Doe confirmed that the events she described occurred and were not false statements. Further, the jury was instructed on how to evaluate witness credibility and Dr. Carmichael explained he had not evaluated Doe or reviewed any of the evidence in this case.

This case can also be distinguished from *Julian*, in which the Court of Appeal determined that the trial court's admission of improper CSAAS evidence deprived the defendant of a fair trial. While *Julian* also involved a credibility dispute between a young victim and defendant, the *Julian* victim's testimony was less consistent than Doe's. Indeed, the prosecutor conceded in closing argument that the victim interviews with the investigator " 'were very different from her testimony' and there were 'some serious inconsistencies.' " (*Julian, supra*, 34 Cal.App.5th at p. 888, italics omitted.)

In addition, the defense counsel in *Julian* did not object to the evidence and instead cross-examined the expert on the statistical evidence, allowing the expert to use "that opportunity to repeatedly reassert his claim that statistics show children do not lie about being abused." (*Id*. at pp. 888–889.) Defense "counsel's questions about multiple studies only opened the door to a mountain of prejudicial statistical data that fortified the prosecutor's claim about a statistical certainty that defendants are guilty." (*Julian, supra*, 34 Cal.App.5th at p. 889.) Further, the prosecutor "asked the jury to rely on [the expert's] statistical evidence that 'children rarely falsify allegations of sexual abuse' " and "reminded jurors that [the expert] 'quoted a Canadian study for over 700 cases, not a single one where there was a false allegation.' " (*Ibid*., italics omitted.) And defense counsel highlighted the "mountain" of

statistical evidence in his closing, directing the jurors' attention "once again, to the statistical study evidence right before they began their deliberations." (*Ibid*.) The error in *Julian*, which supported reversal on the grounds of ineffective assistance of counsel, was far more egregious than the one here.

On this record, we do not agree with Catarino that it is reasonably probable the jury would have returned a more favorable verdict absent the error. Accordingly, reversal on this ground is not warranted.

## II

In several interrelated arguments, Catarino next contends the court improperly imposed consecutive sentences for the six convictions of forcible lewd act on a child under 14. He asserts (1) the Sixth Amendment required the finding of separate offenses to be made by a jury and not a judge, (2) insufficient evidence supported the trial court's finding that the offenses were committed on separate occasions, and (3) the trial court applied the wrong legal standard to find the offenses "separate." Catarino also argues that if we conclude his trial counsel did not preserve these issues for review, he was denied the effective assistance of counsel. As we shall explain, we reject these arguments and affirm the court's imposition of consecutive sentences on counts 1 through 6.

## A

After the jury rendered its verdict, the prosecution filed a sentencing memorandum arguing consecutive sentencing was required under section 667.6, subdivision (d) because each of the charges of which the jury convicted Catarino occurred on separate occasions. The memorandum argued alternatively that the court should impose consecutive sentences under section 667.6, subdivision (c), which allows consecutive sentencing if the acts were perpetrated on the same occasion on one victim. Catarino filed a

memorandum in response, arguing there was an insufficient basis to impose consecutive sentences on more than four counts because the verdict forms did not identify which discrete acts constituted the offenses for which he was convicted. Catarino conceded Doe had described four separate instances of molestation during her testimony, but argued that three of seven sentences should be stayed under section 654.

At the sentencing hearing, the parties repeated the positions stated in their briefing. The trial court rejected Catarino's argument and imposed consecutive sentences for all seven convictions. The court found that "the victim testified that the defendant one, bit her chest more than one time; two, pressed his penis against her more than one time; three, touched the skin of her vaginal area, which she referred to as her pineapple; four, touched her vaginal area over the clothes more than one time; five, had her on his lap and moved like a worm one time; six, tried to take off her pants; and seven, put his hand under her shirt over her bra one time." In response to Catarino's argument that "the information and verdict forms do not provide enough on their face to determine which [discrete] acts constitute each offense," the court read aloud the jury instruction on unanimity, CALCRIM No. 3501[2], and noted that the jury was presumed to have followed the instruction. The

_____

[2] The instruction stated: "The defendant is charged with LEWD OR LASCIVIOUS ACT ON A CHILD BY FORCE, VIOLENCE, DURESS MENACE AND FEAR in Counts 1–8 sometime during the period of June 8, 2015 to March 9, 2016. [¶] The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless: [¶] 1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense; [¶] OR [¶] 2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged."

14

court then stated, "the jury convicted the defendant of seven separate incidents pursuant to Penal Code section 667.6, [subdivision] (d)."

B

"Section 667.6, [subdivision (d)] requires consecutive terms for each violation of certain sex crimes (including [§ 288, subd. (a)]), 'if the crimes ... involve the same victim on separate occasions.'  (§ 667.6, subd. (d).)"  (*People v. King* (2010) 183 Cal.App.4th 1281, 1324 (*King*).)  Under subdivision (c), the statute also authorizes the trial court to impose consecutive terms for convictions of the specified sex crimes "if the crimes involve the same victim on the same occasion."  (§ 667.6, subd. (c).)

Section 667.6, subdivision (d) provides guidance for determining separate occasions:  "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior.  Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."
(§ 667.6, subd. (d).)  "A finding that the defendant committed the sex crimes on separate occasions 'does not require a change in location or an obvious break in the perpetrator's behavior.'  (*People v. Jones* (2001) 25 Cal.4th 98, 104.)"  (*King, supra*, 183 Cal.App.4th at p. 1325.)

"Once the trial court has found, under section 667.6, subdivision (d), that a defendant committed the sex crimes on separate occasions, we will reverse 'only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before

15

resuming his assaultive behavior.' " (*King, supra*, 183 Cal.App.4th at p. 1325.)

C

As an initial matter, Catarino contends that, because no jury made factual findings as to whether the offenses took place "on separate occasions," mandatory consecutive sentences are prohibited as a violation of his right to a jury trial. "However, the United States and California Supreme Courts have held that the decision whether to run individual sentences consecutively or concurrently does not implicate the Sixth Amendment right to jury trial. (*Oregon v. Ice* (2009) 555 U.S. 160, 162–165; *People v. Black* (2007) 41 Cal.4th 799, 820–823.)" (*King, supra*, 183 Cal.App.4th at p. 1324.)

No authority cited by Catarino calls this rule into question. Rather, the cases he relies upon, *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Alleyne v. United States* (2013) 570 U.S. 99, require a jury to determine factual questions that increase the punishment for a particular criminal offense. The rules announced in these cases do not apply to the court's determination of whether to impose consecutive sentences for convictions of *multiple* criminal offenses. (See *Oregon v. Ice* (2009) 555 U.S. 160, 168 [The "twin considerations—historical practice and respect for state sovereignty—counsel against extending *Apprendi*'s rule to the imposition of sentences for discrete crimes. The decision to impose sentences consecutively is not within the jury function that 'extends down centuries into the common law.' [Citation.] Instead, specification of the regime for administering multiple sentences has long been considered the prerogative of state legislatures."].) Accordingly, we reject Catarino's Sixth Amendment claim.

Alternatively, Catarino argues insufficient evidence supported the court's determination that the crimes perpetrated against Doe occurred on

16

separate occasions as that term is used in section 667.6, subdivision (d). This assertion is belied by the record. As the Attorney General outlines in his brief, Doe testified to *at least* six instances of abuse: (1) Doe testified the first time the abuse occurred, Catarino stood behind her so that she felt his penis, moved like a worm, and touched her vagina under her clothes; (2) Doe also stated Catarino stood behind Doe and pressed his body against her more than twice (showing a second and third separate instance that occurred standing); (3) Doe also described the instance that Catarino pulled her pants down as separate; (4) likewise, Doe described another separate incident in which Catarino called her into his room, made her sit on his lap, and grinded against her while he held her in place; (5) Doe described as a separate incident the final instance of abuse, which occurred the night of her aunt's birthday party; and (6) Doe testified that Catarino bit her chest twice, rubbed her vagina over her clothes more than once, and put his hand under her shirt and touched her bra.

This testimony was sufficient to support the trial court's determination that Catarino committed six separate acts in violation of section 288, subdivision (a), i.e. that he "had a reasonable opportunity to reflect upon his … actions and nevertheless resumed sexually assaultive behavior." (§ 667.6, subd. (d).) (See *People v. Garza* (2003) 107 Cal.App.4th 1081, 1092 ["[W]e may reverse only if *no reasonable trier of fact* could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior."], italics added.)

Finally, we reject Catarino's contention that the trial court based its determination on an incorrect legal standard. The trial court's reference to the jury's six separate verdicts and the fact they were rendered after the court provided the jury with the unanimity instruction, does not show that

17

the court improperly relied only on the unanimity instruction in making its section 667.6, subdivision (d) findings. Rather, the trial court was provided with the applicable law before the sentencing hearing in briefing by both parties and in the sentencing report prepared by the probation department. Contrary to Catarino's assertion, the court's reference to the jury's separate, unanimous verdicts supported its determination of separate instances of abuse. The unanimity rule was not in conflict with such findings and Catarino has provided no reason to reject the presumption that the court knew the governing law. (See *People v. Braxton* (2004) 34 Cal.4th 798, 814 ["A trial court is presumed to know the governing law …."].)

III

Lastly, Catarino asserts the court erred by imposing a consecutive sentence on the attempt conviction. The Attorney General concedes the error, agreeing that remand for resentencing on count 7 is required. As both parties correctly point out, "[i]t is well established that the offenses enumerated within section 667.6 do not include attempted sex crimes." (*People v. Rodriguez* (2012) 207 Cal.App.4th 204, 217.)

"[W]hen a defendant is convicted of both violent sex offenses and crimes to which section 1170.1 applies, the sentences for the violent sex offenses must be calculated separately and then added to the terms for the other offenses as calculated under section 1170.1." (*People v. Pelayo* (1999) 69 Cal.App.4th 115, 124.) Thus, the matter must be remanded for the trial court to resentence Catarino in accordance with sections 1170.1 for count 7 and 667.6, subdivision (d) for counts 1 through 6.

18

DISPOSITION

The judgment is affirmed and the matter is remanded for the trial court to resentence Catarino in accordance with sections 1170.1 for count 7 and 667.6, subdivision (d) for counts 1 through 6.

McCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


DO, J.