Filed 1/18/22  P. v. Chester CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).   This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>LENARD LEN CHESTER,<br><br>  Defendant and Appellant. | 2d Crim. No. B307811<br>(Super. Ct. No. 2019009361)<br>(Ventura County) |

Lenard Len Chester ("appellant") appeals from the judgment entered after a jury found him guilty of first degree murder.  (Pen. Code, §§ 187, subd. (a), 189.)[1]  The jury also found true the special circumstance allegations that he committed the murder while engaged in the commission of rape and burglary. (Former § 190.2, subds. (a)(17)(iii) & (a)(17)(vii).)  Appellant committed this crime over 40 years ago.  He was finally identified as the perpetrator through a "cold hit" DNA match.  The trial

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

court sentenced appellant to prison for life without the possibility of parole. Appellant contends reversal is required because the trial court erroneously instructed the jury regarding his prior uncharged sexual offenses and failed to instruct the jury that an independent felonious purpose was required to find true the special circumstance allegations of rape-murder and burglary-murder. We reject appellant's contentions and affirm the judgment.

## STATEMENT OF FACTS

*The 1980 Burglary, Rape and Murder of Sarah B.*

On December 1, 1980, sometime after 10:00 a.m., concerned neighbors entered the home of 81-year-old Sarah B. to check on her after she failed to answer the door earlier that morning. They discovered her lying naked on the floor of her master bedroom with her body partially inside her closet. She was incoherent, had severe bruising about her face and body, and was in obvious pain.

When police officers arrived at the scene, they observed the house was in disarray with items knocked over and out of place. When they contacted Sarah B., they observed she had sustained multiple injuries and bruising. The bruising covered the entire front of her body and appeared mottled, as if caused by individual strikes. She had mucous and a small amount of blood oozing from her lips. She also had several lacerations and abrasions to her arms, upper chest, knees, as well as a large abrasion to the front pelvic bone area of her hips.

Sarah B. was transported to the hospital but later died from her injuries.

A post-mortem rape examination was conducted. The physician observed obvious bruising on Sarah B.'s face, both

2

breasts, her genital area, and knees. There were also deep gouges in her skin that appeared to be caused by fingernails, and she had bruising and lacerations over the suprapubic area as if someone had ripped down her pants. The physician concluded Sarah B. had suffered a forced rape because there were "classic" signs of "forced [vaginal] entry." He also noted that the bruising and lacerations on her body were consistent with Sarah B. having suffered a "beat[ing]." He concluded Sarah B. died from cardiopulmonary arrest. Based on these findings, the physician prepared a rape kit, which was turned over to the police.

An autopsy was conducted and revealed that Sarah B. had sustained blunt force trauma to the head resulting in a collection of blood on the brain, otherwise known as a "subdural hematoma." The medical examiner opined that the normal amount of subdural blood should be zero and that in general, 20 to 30 milliliters of blood collecting around the brain could be fatal for an 81 year-old-person. In Sarah B.'s case, the subdural hematoma measured 150 milliliters, which could be fatal for any person. The medical examiner concluded Sarah B. died of multiple blunt force injuries and the manner of death was homicide.

*The 1981 Prior Uncharged Sexual Offenses*

On September 2, 1981, Jacquelyn O. was 60 years old and lived alone in her mobile home in Camarillo. She had just returned home from walking her dog that morning when appellant, who was 19 or 20 years old at the time, burst into her home through the back door. He asked for a gas can and when Jacquelyn O. said she did not have one, appellant pushed her into the bedroom. When she screamed, appellant put his hand over her mouth and told her to be quiet. He threw a blanket over her

3

head and told her to keep it there. Appellant then raped Jacquelyn O. Afterward, he asked for money, which she gave to him while the blanket was still over her head. After appellant searched Jacquelyn O.'s home for other items to steal, he put her in the closet and told her to keep the blanket over her head. He remained in the house for approximately two hours before leaving.

On September 10, 1981, Mary S., who was approximately 27 or 28 years old at the time, returned to her Oxnard apartment following an early morning bicycle ride. As she exited the shower, appellant attacked her, threw her to the floor and told her he had a knife. She grabbed the knife and cut her hand, so she stopped resisting. Appellant then raped Mary S. Afterward, he put a towel over her head, took her to the living room, and searched for items to steal. Appellant warned her not to look at him. He then took her to the bedroom, shoved her into the closet and continued to rummage through the apartment. Mary S. was still in the closet when he left.

On September 16, 1981, Matty W. was 69 years old and lived in Oxnard. At around 11:00 p.m., appellant broke into her home and attacked her. He straddled her legs and struck her in the head. He told her to be quiet and continued to strike her as she yelled. Alice D., Matty W.'s daughter, heard the commotion and interrupted the attack. Appellant fled through the back door. Matty W. noticed her wallet was missing after the attack.

On September 17, 1981, Jane W. was 74 years old, physically impaired and lived alone in her mobile home in Oxnard. At around 11:30 p.m., as she was getting ready for bed, appellant broke into her home through her bedroom window. When Jane W. screamed, appellant knocked her to the ground,

4

covered her mouth, put something over her head and warned her to be quiet. He started opening drawers, then got undressed, got into bed with Jane W. and raped her. Afterward, he put her in the closet and warned her that if she did not cooperate, he would use his knife. She remained in the closet for four hours. She noticed items were missing from her home after appellant left.

Appellant was convicted by jury trial in each of the prior uncharged sexual offenses.

*Forensic Cold Case Investigation*

In September 2018, almost 40 years after Sarah B. was killed, investigators working on "cold case" homicides in Ventura County submitted a request to the Ventura County Sheriff's Department Crime Laboratory to perform DNA analysis on the rape kit from Sarah B.'s homicide case. That analysis identified a single donor male DNA profile from the sperm cell fraction extracted from the vaginal wash collected at Sarah B.'s post-mortem examination. The profile was entered into the Combined DNA Index System (CODIS), a national database that allows users to match an unknown profile with the profile of individuals in the system.

Appellant's DNA was in the system and was a match.[2]

In February 2019, pursuant to a search warrant, a police detective obtained a buccal swab from appellant. Forensic analysis compared the reference sample from appellant's buccal swab to the profile previously obtained from the sperm cell fraction from Sarah B.'s vaginal wash. The two profiles were a match.

---

[2] The likelihood of such a match is 1 in 130 octillion African Americans, 1 in 11 nonillion Caucasians, and 1 in 1.2 nonillion Hispanics.

Investigators also compared appellant's reference sample to semen samples found on several items recovered from Sarah B.'s bedroom including a blanket, cover sheet, bottom sheet, and a bra. Each included appellant as a possible contributor with a very high population frequency calculation.

*Subsequent Investigation*

In February 2019, appellant spoke with investigators. Appellant admitted that he lived approximately a third of a mile from Sarah B.'s house in 1980 but denied any knowledge of Sarah B. or ever having been inside her home. When asked why he committed the 1981 crimes, he said a psychologist told him that it was because of "money issue[s]" and that he was living "in the fast lane and people do what they have to do to sustain it." However, when investigators showed appellant photographs of the women from his 1981 sexual assault offenses and included a picture of Sarah B., he denied ever having met, dated, or harmed any of the women pictured.

Appellant was arrested and transported to the Ventura County Jail. During an interview with investigators, appellant again denied knowing Sarah B. or that he had ever been in her home. When confronted with the DNA evidence indicating otherwise, he said he had no idea how it got there and did not remember anything about it.

*Recorded Jailhouse Phone Calls*

Between May 13, 2019 to August 29, 2019, appellant made numerous recorded telephone calls from the jail to family members in which he tried to create a story that would explain how his DNA was found inside of Sarah B. and how she was injured. Specifically, he proposed that she was a prostitute and they had sex in an alley, and that afterward, she was attacked by

6

other individuals who tried to rob her. Appellant later abandoned this story.

*Defense*

The defense questioned the integrity of the DNA and specifically challenged the chain of custody and possible contamination from appellant's prior 1981 crimes. The defense also presented evidence of three latent fingerprints obtained from the doorjamb of Sarah B.'s home that were either inconclusive or did not implicate appellant.

## DISCUSSION

Appellant challenges two jury instructions on appeal. First, he contends the trial court erred in giving CALCRIM NO. 375 because it permitted the jury to use the evidence of his four prior uncharged sexual offenses to prove identity, intent, motive, and plan or scheme to commit "murder" in this case, even though the prior offenses did not include murder. He contends the "proper and limited use" of the prior offenses would have been to prove only the underlying burglary and rape special circumstances. Second, he contends the trial court failed to instruct on an "essential element of the charge" when it omitted the "independent felonious purpose" language from the special circumstances instruction pursuant to CALCRIM No. 730.

*Forfeiture and Invited Error*

Respondent preliminarily argues appellant forfeited his instructional claims on appeal for failing to object at trial, and even if there was no forfeiture, appellant's claims are barred under the doctrine of invited error. Appellant concedes he did not object at trial, but contends his claims are still reviewable because the alleged error affects his substantial rights.

7

Generally, failure to object to instructional error forfeits the issue on appeal unless the error affects an appellant's substantial rights. (§ 1259; *People v. Harris* (1981) 28 Cal.3d 935, 956-957; *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) "The cases equate 'substantial rights' with reversible error, i.e., did the error result in a miscarriage of justice[.]" (*People v. Arredondo* (1975) 52 Cal.App.3d 973, 978; *People v. Watson* (1956) 46 Cal.2d 818, 835-836 (*Watson*).)

If, however, appellant invited the error by making a "'conscious and deliberate . . . choice'" in "'request[ing]' the instruction," he is barred from challenging the requested instruction on appeal. (See *People v. Lucero* (2000) 23 Cal.4th 692, 723.) Invited error will not be found merely because the record is silent. (*People v. Wickersham* (1982) 32 Cal.3d 307, 330-332, 334 (*Wickersham*), disapproved on another point in *People v. Barton* (1995) 12 Cal.4th 186, 200-201.)

There is no invited error here because nothing in the record indicates appellant's counsel consciously or deliberately "requested" the instructions. Instead, counsel said nothing at all about the challenged instructions. Silence alone is not enough to conclude any error was invited. (*Wickersham, supra*, 32 Cal.3d at p. 334.)

However, we agree with respondent that appellant forfeited his instructional claims because he did not object to the instructions or request a modification. We have examined the record and conclude the instructions did not affect appellant's substantial rights because it is not reasonably probable the jury would have reached a different result absent the asserted error. (See *Watson, supra*, 46 Cal.2d at pp. 835-836.) Had the

8

contentions not been forfeited, we would reject them for the reasons explained below.

*CALCRIM No. 375*

Appellant contends the trial court's instruction to the jury limiting the use of his prior uncharged sexual offenses was "flawed" because it erroneously permitted the jury to "infer[]" his intent, motive, plan or scheme to commit murder when his prior offenses did not include murder.  But appellant was charged here with burglary and rape special circumstances.  His prior uncharged offenses were for burglary and rape.  There was no error.

A claim of instructional error is reviewed de novo.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.)  If a jury instruction is confusing or ambiguous, the inquiry is whether there is a reasonable likelihood that the jury "misunderstood and misapplied the instruction." (*People v. Smithey* (1999) 20 Cal.4th 936, 963; *People v. King* (2010) 183 Cal.App.4th 1281, 1316 ["An instruction is considered flawed only if there is "'a reasonable likelihood that the jury misconstrued or misapplied the words" of the instruction. [Citation.]'"].)  "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."' [Citations.]'" (*Smithey*, at pp. 963-964.)

The trial court instructed the jury pursuant to a modified version of CALCRIM No. 375 as to how the jury could consider evidence of appellant's uncharged offenses.

That instruction provided:

"The People presented evidence that the defendant committed the offenses of burglary, rape by force or violence, and

9

assault with the intent to commit rape by means of force likely to produce bodily injury that was not charged in this case.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether:

A. The defendant was the person who committed the offense alleged in this case;

B. The defendant acted with the intent to steal in this case;

C. The defendant had a motive to commit the offense alleged in this case;

D. The defendant knew victim did not consent when he allegedly acted in this case;

E. The defendant's alleged actions were not the result of mistake or accident; [or]

F. The defendant had a plan or scheme to commit the offense alleged in this case;

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offense.

"Do not consider this evidence for any other purpose.

10

"If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of first degree murder or that the special circumstances have been proved. The People must still prove the charge and the special circumstances beyond a reasonable doubt." (CALCRIM No. 375.)

Appellant contends the jury could have misunderstood the phrase "the offense alleged in this case" to mean murder, rather than burglary or rape. There is no reasonable likelihood that the limiting instruction could have been misunderstood in this manner because the "offense alleged in this case" included burglary and rape, and the jury was so instructed pursuant to CALCRIM No. 540A.

That instruction provided:

"The defendant is charged with murder, under a theory of first degree felony murder.

"To prove that the defendant is guilty of first degree murder under this theory, the People must prove that:

1. The defendant committed or attempted to commit burglary or rape by force or violence;

2. The defendant intended to commit burglary or rape by force or violence; AND

**3.** While committing or attempting to commit burglary or rape by force or violence, the defendant caused the death of another person." (CALCRIM No. 540A.)

In addition to these instructions, the prosecutor opined in his closing argument that evidence of appellant's prior uncharged offenses was relevant because it showed the "very similar" way

11

he committed the prior burglaries and rapes and the way he committed the burglary and rape of Sarah B.

Accordingly, the jury would have understood the "offense alleged in this case" to mean burglary or rape. For us to accept appellant's theory, we would have to presume the jury disregarded not only the limiting instruction at issue, but the other jury instructions, the trial court's oral admonitions, and both counsels' explanation of the evidence and the law. This we cannot do. (See *People v. Davidson* (2013) 221 Cal.App.4th 966, 973 ["It is presumed that the jury understood and followed the instruction"].)

Even if we were to find the instruction was erroneous, which we do not, we conclude any error was harmless under any applicable standard. (*Watson, supra,* 46 Cal.2d at p. 836; *Chapman v. California* (1967) 386 U.S. 18, 24.) The evidence establishing appellant's guilt was overwhelming including the DNA evidence, appellant's failed attempt to explain it away, along with his prior uncharged sexual offenses, which demonstrated appellant had the intent, motive, and a plan or scheme to burglarize and rape elderly women.

*CALCRIM No. 730*

Next, appellant contends the jury was erroneously instructed on the elements of the special circumstance allegations because the trial court did not include the optional paragraph of CALCRIM No. 730. That paragraph provides: "In addition, in order for this special circumstance to be true, the People must prove that the [appellant] intended to commit [burglary or rape] independent of the killing. If you find that the [appellant] only intended to commit murder and the commission of [burglary or

12

rape] was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved."

The bench notes for CALCRIM No. 730 direct the trial court to give this optional paragraph "if the evidence supports a reasonable inference that the felony was committed merely to facilitate the murder." The bench notes cite to several cases, including *People v. Green* (1980) 27 Cal.3d 1 (*Green*), overruled on another ground by *People v. Martinez* (1999) 20 Cal.4th 225, 241, and *People v. Navarette* (2003) 30 Cal.4th 458, 505 (*Navarette*)).

In *Green*, the Court found insufficient evidence as a matter of law to support the jury's finding of robbery as a special circumstance to the murder. (*Green*, *supra*, 27 Cal.3d at p. 62.) There, the defendant lured his wife to an isolated area, shot and killed her. He then took her belongings to prevent her from being identified. (*Ibid.*) The Court held the crime was not a murder committed during the commission of a robbery because the primary crime was murder and the "robbery was incidental to that murder." (*Id.* at pp. 61-62.) However, if the defendant has an "'independent felonious purpose' (such as burglary or robbery) and commits the murder to advance that independent purpose, the special circumstance is present." (*Navarette*, *supra*, 30 Cal.4th at p. 505; *Green*, at p. 61; see *People v. Davis* (2009) 46 Cal.4th 539, 609.)

Here, the trial court was not required to give the optional language because the evidence did not support a "reasonable inference" that the burglary and rape were committed merely to "facilitate the murder" or that they were incidental to the murder. We reject appellant's contention that there was "sufficient evidence" that appellant intended to kill Sarah B. and the "theft and rape were afterthoughts prior to her death."

Unlike *Green*, the record includes no evidence that the crime in this case was a burglary and rape in the commission of a murder. Instead, the evidence showed that Sarah B. was still alive, albeit barely, when neighbors found her naked on the floor of her closet. The house was in disarray with items strewn about and her purse was missing. The pattern of appellant's behavior in this case is strikingly similar to his pattern of behavior in the 1981 crimes. He attacked mostly vulnerable, elderly women. He quickly overpowered them and threatened them with violence if they screamed or resisted. He raped them and afterward put them in the closet while he looked for things to steal. This is strong evidence showing that the murder in this case was committed in the commission of a burglary and rape.

Appellant's contention that the optional language was "required" or that it was an "essential element of the charge" is contradicted by the cases following *Green*. Those cases instruct that *Green*'s clarifying language was not intended to become an "'"element" of such special circumstances, on which the jury must be instructed in all cases regardless of whether the evidence supports such an instruction.'" (*People v. Valdez* (2004) 32 Cal.4th 73, 113-114, quoting *People v. Kimble* (1988) 44 Cal.3d 480, 501 and citing *Navarette, supra*, 30 Cal.4th at p. 505 [no error in giving a "truncated instruction" where no significant motive of murder exists other than robbery].)

Accordingly, we find no instructional error.

### *Cumulative Error*

Appellant argues the cumulative effect of the alleged errors denied him a fair trial. Our review of the record discloses that none of the purported errors, either singularly or cumulatively, denied appellant a fair trial. An appellant is entitled to a fair

14

trial, not a perfect one.  (*People v. Peyton* (2014) 229 Cal.App.4th 1063, 1081.)

DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED.


                                              YEGAN, J.


We concur:



        GILBERT, P.J.



        TANGEMAN, J.

Ryan J. Wright, Judge

Superior Court County of Ventura

_____

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, David M. Glassman, Deputy Attorney General, for Plaintiff and Respondent.